LUCIEN H. TYNG, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILLIAM BUCHSBAUM, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 74885, 74886. Promulgated June 8, 1937.

*Wayne Johnson, Esq.*, for the petitioner in Docket No. 74885.

*J. Robert Sherrod, Esq.*, and *C. Edward Paxson, Esq.*, for the petitioner in Docket No. 74886.

*J. Arthur Adams, Esq.*, and *Frank A. Surine, Esq.*, for the respondent.

OPINION.

MURDOCK: The Commissioner determined deficiencies in income taxes as follows:

| Petitioner | Docket No. | Year | Amount |
|---|---|---|---|
| Lucien H. Tyng | 74885 | 1929 | $1,139,736.06 |
| William Buchsbaum | 74886 | 1929 | 799,516.90 |
| Do | do | 1930 | 9,882.97 |
| Do | do | 1931 | 9,860.87 |

The parties have agreed upon the proper adjustment of a number of their original differences. The first issue for decision is common to both proceedings. It is whether a transaction, whereby the Associated Gas & Electric Co. acquired the stock of two other corporations for cash and certain of its debentures, constituted a statutory reorganization so that the gain realized by the petitioners from the disposition of their stock was taxable only to the extent of the cash received. The second issue, likewise common to both proceedings, is whether all of the shares of stock disposed of by the petitioner were capital assets within the meaning of the capital net gain provision of the statute. The Commissioner contends that only part of the shares were capital assets. The third issue relates only to Tyng. It involves attorney's fees paid by Tyng in connection with the disposition of his stock. Tyng contends in his brief that the amount paid should be deducted as an ordinary and necessary business expense. The Commissioner contends that it should be apportioned between the shares which are admittedly capital assets and those which may be held not to be capital assets and deducted from the proceeds allocable to each class of shares in computing the capital gain and the ordinary gain. The fourth issue is whether Buchsbaum is entitled to deduct from his income for 1929, 1930, and 1931 certain losses sustained in the operation of a farm. The parties have stipulated or agreed upon all of the facts of record relating to issues 1, 2,

and 3. A detailed statement of those facts would serve no useful purpose here. Instead, a summary will suffice.

## First Issue.

The petitioners, Tyng and Buchsbaum, were among the business associates of William S. Barstow. The group specialized, among other things, in managing and financing public utilities. The members of this group, their employees, and one other person in 1929 owned all of the outstanding stock of the Barstow Securities Corporation (hereinafter called Securities of Delaware). Securities of Delaware in the early part of 1929 owned 94,005 shares of the common stock of W. S. Barstow & Co. (hereinafter referred to as Barstow of Delaware). Buchsbaum owned 1,800 shares of the same kind of stock and others owned the remaining 9,960 shares of common. There were also 8,981 shares of preferred outstanding. Barstow of Delaware owned about 55½ percent of the voting stock of General Gas & Electric Corporation. The Associated Gas & Electric Co. (hereinafter called Associated), was seeking control of the General Gas & Electric Corporation and offered to pay $50,000,000 in cash for all of the common stock of Securities of Delaware and Barstow of Delaware. Barstow and the petitioners refused to accept the offer unless part of the consideration would be paid in securities of Associated. One of their purposes in requiring that part of the consideration be paid in securities of Associated was to avoid income taxes. Associated, in order to frustrate attempts being made by other interests to acquire control of the General Gas & Electric Corporation, insisted that Barstow and his associates sign a contract at once which would bind them to the bargain but, at the same time, would permit the parties to work out the details of the form of the consideration. Barstow and the other stockholders of Securities of Delaware and of Barstow of Delaware on February 5, 1929, signed a contract for the sale of their stock to Associated for $50,000,000 in cash. They signed that contract only after an oral agreement that it would be modified by one providing for payment of a part of the consideration in securities of Associated as soon as the parties could agree upon the classes and amounts of securities. Associated deposited an initial cash payment of $10,000,000. The parties entered into another contract on February 11, 1929, pursuant to the oral agreement of February 5, 1929. The later agreement provided that the selling stockholders should accept certain issues of debentures, or evidences of indebtedness, of Associated as a part of the consideration for their stock. A final settlement was made on April 12, 1929. The stockholders had the right at that time to make further designations of specified debentures of Associated which they would take in exchange

for their stock and to elect to take a part of the consideration in such securities and a part in cash, or all in cash. Associated actually paid $34,699,528.54 in cash and issued certain of its obligations as the balance of the consideration for all of the stock of Securities of Delaware, and the 11,760 shares of the common stock of Barstow of Delaware owned by Buchsbaum and others. The obligations so issued were as follows:

| | |
|---|---:|
| 4½% convertible gold debentures, dated January 15, 1929, due January 15, 1949, face value $11,776,000 at 93 | $10, 951, 680. 00 |
| Accrued interest | 138, 368. 00 |
| Gold debenture bonds, consolidated refunding 5% series, dated October 1, 1928, due October 1, 1968, face value $4,255,000 at 90 | 3, 829, 500. 00 |
| Accrued interest | 117, 012. 50 |
| 5½% convertible investment certificates, due November 15, 1938, face value $175,000, at 97 | 169, 750. 00 |
| Accrued interest | 1, 711. 10 |
| | 15, 208, 021. 60 |

Some of the stockholders took all cash, some no cash, but most took a combination of cash and debentures.

The amounts received by Tyng and Buchsbaum, exclusive of their shares of the interest on the initial deposit of $10,000,000 made February 5, 1929, were as follows:

| | Tyng | Buchsbaum |
|---|---:|---:|
| Cash | $4, 233, 231. 97 | $1, 285, 613. 15 |
| 4½% convertible debentures at 93 | 3, 092, 250. 00 | 3, 093, 180. 00 |
| Accrued interest thereon | 39, 068. 75 | 39, 080. 50 |
| Gold debenture bonds, consolidated refunding 5% series, at 90 | 2, 790, 000. 00 | |
| Accrued interest thereon | 85, 250. 00 | |
| Total | 10, 239, 800. 72 | 4, 417, 873. 65 |

The contract of February 11, 1929, further provided for the acquisition by Associated of all of the preferred stock of Barstow of Delaware, and Associated actually acquired most of those shares for about $980,000 par value of its debentures and a small amount of cash.

Barstow and Buchsbaum were elected directors of Associated in 1929. Barstow resigned in November 1929, and Buchsbaum in January 1933. Buchsbaum also served as vice president of Associated from April 19, 1932, to January 16, 1933. None of the other associates of Barstow who were stockholders of Securities of Delaware or of Barstow of Delaware ever became a director or officer of Associated.

Thus it appears that Tyng surrendered his shares in Securities of Delaware for cash and evidences of indebtedness of Associated, and Buchsbaum surrendered his shares in Securities of Delaware and also his shares in Barstow of Delaware for cash and evidences of in-

debtedness of Associated. There is no dispute as to each taxpayer's basis for gain or loss, nor is there any dispute as to the amount of gain realized by each. The Commissioner contends that the entire gain is recognized, but the petitioners claim that they exchanged their stock pursuant to a plan of reorganization, received for it cash and securities of a corporation a party to the reorganization, and, therefore, their gain is recognized only to the extent of the cash received. See sections 112 (b) (3) and 112 (c) (1) of the Revenue Act of 1928. Although there was not a merger or consolidation by operation of law, the transaction comes precisely within the language contained in parenthesis in section 112 (i) (1) (A) of the Revenue Act of 1928.[1] Associated acquired all of the voting stock and a majority of the total number of shares of all other classes of stock of the two Delaware corporations. Nevertheless, it is necessary to examine the transaction more closely before holding that it is a reorganization. *Gregory* v. *Helvering*, 293 U. S. 465; *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462.

The transaction was obviously a bona fide business deal in which Associated, for business purposes, was acquiring a controlling interest in a large public utility, the General Gas & Electric Corporation. Neither the transaction nor the use of the debentures was in any sense a sham. The stipulated facts do not show whether Securities of Delaware and Barstow of Delaware were dissolved, but the implication is that Associated continued those corporations and through them controlled the stock of the General Gas & Electric Corporation. Previously, Barstow and his associates, through their control of the General Gas & Electric Corporation, had taken quite an active part in the management and affairs of that corporation. The Commissioner, although conceding that the transaction falls within the words of section 112 (i) (1) (A), contends that the transaction was in fact a sale for cash or its equivalent and did not result in the retention by the selling stockholders of a definite substantial and continuing interest in the property transferred.

Associated was apparently willing and desirous of making a purchase of the stock for cash. A consideration of $50,000,000 was agreed upon in the original contract of February 5, 1929. But the sellers never agreed to accept that amount in cash and both parties understood at all times material hereto that a substantial portion of the total consideration was to be paid in securities of Associated. The

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

    \*        \*        \*        \*        \*        \*        \*

    (i) *Definition of reorganization.*—As used in this section and sections 113 and 115—

    (1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation) \* \* \*.

agreement as finally carried out is controlling, regardless of who insisted that it be that way. It is immaterial that the sellers were motivated by tax considerations in demanding that a part of the purchase price be paid in securities of Associated. Not all of the sellers made this demand and some of them received their entire consideration in cash. But the petitioners before the Board were among the majority in number and interest who demanded and received a substantial part of the consideration for their shares in securities of Associated. If, under the statute, a part of their profit is not recognized, it seems immaterial that the entire profit of other sellers was recognized. Cf. *Miller* v. *Commissioner*, 84 Fed. (2d) 415, reversing 29 B. T. A. 1061.

In deciding whether or not there was a plan of reorganization, we must look at the whole agreement of the parties as made and performed. *Watts* v. *Commissioner*, 75 Fed. (2d) 981; affd., 296 U. S. 387. That shows that Associated was a party to the agreement; Associated acquired under that agreement the stock of Securities of Delaware and of Barstow of Delaware in exchange for cash and securities of Associated; the two Delaware corporations were both parties to the reorganization under section 112 (i) (2); the petitioners surrendered their stock for securities of Associated in pursuance of the single plan whereby Associated was to acquire that stock; consequently, if there was a reorganization, the petitioners exchanged stock in a corporation a party to a reorganization in pursuance of the plan of reorganization for securities in another corporation a party to the reorganization. See section 112 (b) (3). Since the exchange was not only for such securities but also for money, the gain to the recipient is recognized in an amount not in excess of the sum of money received. Section 112 (c) (1). It was an essential part of the plan that the securities of Associated should be used in the exchange.

In the foregoing discussion we have assumed that the evidence of indebtedness of Associated received by the petitioners was "securities." The Commissioner contends, however, that the obligations of the purchaser received by the sellers were not "securities" which gave the sellers a definite, material, and substantial interest in the property transferred. It can not be said that the securities actually received were not substantial in amount, and the real question is whether the sellers who received these debentures received securities within the meaning of section 112 (b) (3) and thereby retained a definite, material, and continuing interest in the property transferred. The debentures and obligations of the purchaser received by these sellers were not short term purchase money notes. Cf. *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, *supra*. It is also interesting to note that some of the securities in the present case were convertible

into stock. Cases decided prior to December 16, 1935, on the question of what evidences of indebtedness of a purchaser constitute securities and give the required continuity of interest must now be considered in light of the decisions of the Supreme Court in *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378; *Nelson Co.* v. *Helvering*, 296 U. S. 374; and *Helvering* v. *Watts*, 296 U. S. 387. Following those cases, particularly the *Watts* case, the Board has held in a situation quite like the one here present that bonds of the purchaser received by the sellers are not like cash or short term notes, but are securities, and give a sufficient continuity of interest. *Kaspare Cohn Co., Ltd.*, 35 B. T. A. 646. Following that decision we now hold that there was a sufficient continuity here. Cf. *Commissioner* v. *Kitselman*, 89 Fed. (2d) 458, reversing 33 B. T. A. 494 (a report promulgated by the Board before the Supreme Court decided the *Minnesota Tea, Nelson,* and *Watts* cases). All of the requirements of the statute have been met. It follows that the gain realized by these petitioners is recognized only to the extent of the cash received.

### Second Issue.

Tyng exchanged 21,665 shares of stock of Securities of Delaware and Buchsbaum exchanged 7,540 shares of the stock of Securities of Delaware and 1,800 shares of the common stock of Barstow of Delaware in the transaction discussed in the first issue. The Commissioner determined and still agrees that 15,000 of the shares of Securities of Delaware exchanged by Tyng and the 1,800 shares of Barstow of Delaware exchanged by Buchsbaum were capital assets. But he resists the claim of the petitioners that the remaining 6,665 shares exchanged by Tyng and the 7,540 shares exchanged by Buchsbaum were capital assets within the meaning of section 101 (c) (8) of the Revenue Act of 1928. He points out that Securities of Delaware was organized in December 1927, the petitioners acquired the 6,665 and the 7,540 shares from Barstow for cash under contracts entered into in December 1927, and from December 1927 to the time of the disposition in February 1929 was less than two years. The petitioners contend, however, that to that period there should be added prior periods during which they held property later exchanged for the shares of Securities of Delaware. They say that they acquired property as of October 9, 1925, either in the form of stock of W. S. Barstow & Co. (hereinafter called Barstow of New York), contract rights to such stock, or an interest in a syndicate. Section 101 (c) (8) (A) provides:

In determining the period for which the taxpayer has held property received on an exchange there shall be included the period for which he held the property exchanged, if under the provisions of section 113, the property received has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property exchanged.

Barstow of New York owned 99,685 voting shares of General Gas & Electric Co. in October 1925. Barstow, who owned more than one-half of the common stock of Barstow of New York, wished to prevent his stock in Barstow of New York, in case of his death, from falling into the hands of persons who might dispense with the services of his five close business associates (including Tyng and Buchsbaum). He therefore organized Barstow Securities Corporation (hereinafter called Securities of New York) and transferred to it the stock of Barstow of New York in exchange for all of the common stock of Securities of New York, 14,400 shares. He then placed the 14,400 shares of Securities of New York in the possession of a depositary, with a reservation that the stock should remain in his name and he should have voting rights and the right to receive all dividends on the stock. He entered into a contract on October 9, 1925, to sell some of these shares to his five associates, called therein the "syndicate." The contract was reexecuted in modified form in January 1926, but again was dated October 9, 1925. Barstow agreed, in that contract, to sell 7,350 of the 14,400 shares to his five associates for $600,000, payable in semiannual installments of $40,000 each. The associates agreed upon how many shares each would purchase. Tyng and Buchsbaum were each to get 1,470 shares. The depositary was authorized to deliver to the purchasers 7,190 shares on August 1, 1933 (six months after the last installment was to be paid), and to deliver the remaining 160 shares then or later, as Barstow should direct, or, if he died after August 1, 1933, without having directed, then the shares were to be delivered at the date of his death. In case Barstow died before August 1, 1933, the associates could obtain immediate delivery of the 7,350 shares upon payment of $735,000 less payments theretofore made. The associates were also given an option to purchase the remaining 7,050 shares upon Barstow's death. The purchasers paid four installments aggregating $160,000. The fourth installment was paid on August 1, 1927.

Barstow of Delaware was organized in June 1927, and during that year acquired all of the stock of Barstow of New York, partly for cash and partly in exchange for its own stock. Barstow and his associates organized Securities of Delaware on December 8, 1927. That corporation issued 79,005 shares of its common stock to Barstow on December 13, 1927, for the 14,400 shares of Securities of New York. The 14,400 shares of Securities of New York were released by the depositary with the consent of the associates so that they could be exchanged for the 79,005 shares of Barstow of Delaware. Securities of Delaware at the same time issued 15,000 shares to Tyng in exchange for shares of Barstow of Delaware. Securities of Delaware issued no other stock at that time. Securities of New York was then

dissolved and its assets, consisting of 79,005 shares of the common stock of Barstow of Delaware, were distributed to its sole stockholder, Securities of Delaware. Barstow and his associates, on December 13, 1927, and "as of December 1, 1927", terminated the contract of October 9, 1925. Barstow then entered into separate contracts with each of his five associates, seven employees of Barstow of Delaware, and one other person in which he sold to them a total of 41,326 of the 79,005 shares of common stock of Securities of Delaware which had been issued to him on December 13, 1927. Tyng purchased 6,665 shares and Buchsbaum 7,540.shares. New certificates for the number of shares purchased were issued in the name of each purchaser. The $160,000 paid under the contract of October 9, 1925, was applied in payment of the purchase prices fixed in the new contracts. The balance due under each of the contracts was payable in eleven semiannual installments. The purchase price, applied payments, balance due and semiannual installments, under the contracts of Tyng and Buchsbaum, were as follows:

| | Purchase price | Applied payments | Balance due | Semiannual installments |
|---|---|---|---|---|
| Tyng | $99,168.00 | $26,441.72 | $72,726.28 | $6,611.48 |
| Buchsbaum | 112,188.00 | 29,915.70 | 82,272.30 | 7,479.30 |

Tyng and Buchsbaum made the final payments of the balances of the purchase prices on March 15, 1929. They exchanged the 6,665 and the 7,540 shares thus acquired, together with other shares which they owned, in the transaction with Associated, in 1929.

The following argument is essential to the petitioner's case: The transaction whereby Securities of Delaware issued 79,005 shares of its stock in exchange for the entire capital stock of Securities of New York was a reorganization within the definition of section 112 (i) (1); the 14,400 shares of Securities of New York were exchanged for 79,000 shares of Securities of Delaware pursuant to a reorganization; under section 112 (b) (3) no gain or loss is to be recognized from that exchange, and under section 113 (a) (6), the basis for the 79,005 shares is the same as the basis for the 14,400 shares exchanged; the petitioners owned or had an interest in the 14,400 shares and because of that interest they had a basis for gain or loss on the 14,400 shares; they acquired an interest in the 79,005 shares by reason of the exchange and their old basis carried over and became the basis for gain or loss of their interest in the 79,005 shares; consequently, section 101 (c) (8) (A) applies and there should be added to the period during which they actually held the shares of Security of Delaware the prior period from October 9, 1925, when they first acquired their interest in the 14,400 shares of Securities of New York.

One fatal defect in this argument is that the facts do not support it. The outstanding stock of Securities of New York, 14,400 shares, was owned by Barstow immediately prior to the exchange whereby they were acquired by Securities of Delaware. Barstow exchanged them for 79,005 shares of the stock of Securities of Delaware. If any basis remained the same after that exchange, it was his basis. But he is not a petitioner and the question need not be decided. The contract of October 9, 1925, between Barstow and his five associates, including the petitioners, was a contract *to* sell rather than a contract *of* sale. The intention of the parties as shown by their agreement was that title was not to pass until after certain events had occurred. The stock, with voting rights and the right to dividends, was to belong to Barstow until the $600,000 had been paid. Barstow wanted to protect his associates. As long as the stock was his, they were assured of continued employment; if he died before August 1, 1933, they could protect themselves by paying the balance due and securing control of a majority of the 14,400 shares. The conditions of time and payment of the purchase price, which were conditions precedent to the passing of title, were never fulfilled. Title to the 14,400 shares, the subject matter of that contract, never passed from Barstow to the prospective purchasers. Cf. *Charles W. Dahlinger*, 20 B. T. A. 176; affd., 51 Fed. (2d) 662; certiorari denied, 284 U. S. 673; *Theodore J. Swift*, 20 B. T. A. 1099; affd., 54 Fed. (2d) 746. Before the time for passing of title, the entire contract was terminated by mutual consent. Barstow was permitted to exchange the shares for other shares. After that exchange, he entered into new contracts with the petitioners and others whereby he sold, to the petitioners and the others, stock of Securities of Delaware for cash. The new group included a number of persons who had no interest whatsoever in the contract to purchase the 14,400 shares. The terms of, and the interests acquired under, the new contracts were wholly different from those contracted for under the old contract. The $160,000 paid under the former contract was merely credited as partial payment under the new contracts. Thus the exchange of the 14,400 shares of Securities of New York for 79,005 shares of Securities of Delaware was not an exchange by the petitioners, cf. *Helvering* v. *San Joaquin Fruit Co.*, 297 U. S. 496, and, as to them, effected no carry-over of basis from property transferred to property received. Consequently, it gave them no additional period of ownership applicable to the shares of Securities of New York. Cf. *McFeely* v. *Commissioner*, 296 U. S. 102.

These petitioners purchased shares of Securities of Delaware from Barstow in 1927 for cash. Their bases for gain or loss on those shares was the amount of cash which they paid for them. Certainly

they did not exchange stock or securities in a corporation a party to a reorganization in pursuance of the plan of reorganization solely for stock or securities in another corporation a party to the reorganization within the meaning of section 112 (b) (3). The contract of October 9, 1925, gave them rights which were no doubt valuable. But those rights cost them nothing and had no basis for gain or loss in case they disposed of them. Their consent to the exchange of the 14,400 shares of Securities of New York for the 79,005 shares of Securities of Delaware was necessary because they had an executory contract to purchase some of the shares of Securities of New York. Since they had no title to any of the shares of Securities of New York, and section 112 (b) (3) does not apply, the exchange of property would be material only if section 112 (b) (5) applies. Their rights under the contract of October 9, 1925, were, in a sense, property, yet that property was not transferred by them to a corporation solely in exchange for stock or securities of the corporation, and, furthermore, immediately after the transfer of December 13, 1927, the five associates of Barstow, parties to the agreement of October 9, 1925, were not in control of Securities of Delaware. Section 112 (b) (5) does not apply. Thus the conditions under which sections 113 (a) (6) and 101 (c) (8) (A) become applicable do not exist in this case.

Furthermore, the contract to purchase the shares of Securities of New York in no other way justifies including in the period of the ownership of the shares of Securities of Delaware by these petitioners any period prior to the date upon which they purchased the shares of Securities of Delaware. If they had actually acquired some of the 14,400 shares of Securities of New York under the contract of October 9, 1925, their period of ownership of those shares would not have begun on October 9, 1925. On the contrary, their period of ownership of those shares would have begun only on the date or dates upon which they acquired title. They had paid only four-fifteenths of the purchase price and had not acquired title to any of the shares in December 1927. Consequently, their period of ownership had not then begun. The fact that Barstow, the owner of the shares, exchanged them in December 1927 for other shares which he thereafter sold to the petitioners, is certainly no reason for holding that the period of ownership of the shares subsequently acquired by the petitioners began prior to December 1927. The 6,665 and the 7,540 shares of Securities of Delaware disposed of by these petitioners in the exchange discussed under the first issue were not capital assets in the hands of these petitioners because they had not been held for more than two years and there are no prior periods to be added under any of the provisions of the statute.

### Third Issue.

The assignment of error in the Tyng petition raising this issue is as follows:

The Commissioner has erroneously disallowed as a deduction from the cash received by the petitioner on the exchange of his 21,665 shares of the Barstow Securities Corp. (Del.) in 1929, the sum of $25,118.88, being the legal expenses, necessarily incurred and paid by the petitioner in connection with the said exchange.

The stipulated facts show that Tyng was not able to be present at all times during the negotiations with Associated which finally resulted in the disposition by him of 21,665 shares of Securities of Delaware. He employed an attorney who represented him while he was absent during a part of the negotiations. He paid the attorney $25,000 in 1929 for his services, but the amount was not allowed as a deduction or as an offset against "the income derived from this transaction." The Commissioner, in determining the deficiency, treated 15,000 shares as capital assets, taxed the gain under the capital gain provisions, and taxed the gain on the disposition of the 6,665 shares as ordinary gain. He now concedes and contends that the $25,000 is deductible as a part of the cost of the 21,665 shares, and that 15,000/21665 should be deducted in computing the gain from the disposition of the 15,000 shares which were capital assets, and the remainder should be deducted in computing the gain from the disposition of the 6,665 shares which were not capital assets.

The petitioner contends in his brief that the $25,000 should be allowed as a deduction for ordinary and necessary expenses of his business. Not only do the facts fail to show that this was an ordinary and necessary expense of any business which he regularly carried on, but the assignment of error is hardly sufficient to raise such an issue. "Stipulations concerning facts and any other evidence properly are accommodated to issues adequately raised", *General Utilities & Operating Co.* v. *Helvering*, 296 U. S. 200, 206, but issues not properly raised will not be decided. Commissions and other expenses incurred in selling or disposing of securities are generally treated as an offset in computing the gain from the sale or disposition. The $25,000 paid by Tyng to his attorney was paid in connection with the disposition of his shares. Such expenditures are properly an offset, either as a part of the cost or in reduction of the amount realized, in computing the gain from the disposition of the shares, rather than an ordinary and necessary expense of a business regularly carried on. Cf. *Helvering* v. *Union Pacific Railroad Co.*, 293 U. S. 282; *Marjorie Post Hutton*, 12 B. T. A. 265; affd., 39 Fed. (2d) 459; *Florence G. Baldwin*, 23 B. T. A. 512; *Mrs. E. A. Giffin*, 19

B. T. A. 1243; *Briarcliff Investment Co.*, 30 B. T. A. 1269; *Pidgeon-Thomas Iron Co.*, 27 B. T. A. 642; *Alice G. Kales*, 34 B. T. A. 1046. The allocation between the capital assets and the shares which were not capital assets finds support in *Florence G. Baldwin*, 23 B. T. A. 512, 521. The treatment now urged by the Commissioner is the best suggested and will be followed.

## Fourth Issue.

There was no stipulation in regard to this issue. The following facts are found from the testimony and other evidence presented at the hearing.

Buchsbaum, after disposing of his shares in the two Delaware corporations, ceased his business activity in connection with public utilities. He decided to breed, develop, and sell high grade saddle horses. For this purpose he purchased a farm in New Jersey in April 1929. The original tract consisted of 97 acres. By the end of 1930 he had purchased additional tracts containing 80 acres. The total cost of the farm was $68,502.53. There was a very old house on the property and a new cow barn. These buildings were worth about $17,000 in 1929. The petitioner began to make substantial improvements to the properties. He remodeled the house at a cost of $12,388.65 and transformed the cow barn into a horse stable at a cost of $28,201.35. He also made other substantial expenditures for improvements during the taxable years. He had had some experience in farming and with horses. The farm was in a good locality for breeding, training, and selling saddle horses. The market for saddle horses was good at that time. The petitioner spent most of his time at the farm during 1929 and practically all of his time thereafter. The only produce raised on the farm was that required for the use of the stables. He employed a farm superintendent and a number of other persons. The house was occupied by some of these employees. The following table shows the number of horses purchased, foaled, sold or disposed of, and the cost and amount realized from the sale or death of horses, including insurance.

| Year | Pur-chases | Foaled | Sold or died | Cost[1] | Amount realized | Gain or loss |
|---|---|---|---|---|---|---|
| 1929 | 21 | 3 | 2 | $1,239.28 | $2,010.00 | +$720.72 |
| 1930 | 9 | 4 | 3 | 5,668.00 | 4,279.13 | −1,388.87 |
| 1931 | 4 | | 8 | 6,997.20 | 3,206.50 | −3,790.70 |
| 1932 | | | 1 | 1,030.50 | 50.00 | −980.50 |
| 1933 | 6 | 8 | 7 | 20,222.12 | 8,679.75 | −11,542.37 |
| 1934 | | | 2 | 350.00 | 500.00 | +150.00 |
| 1935 | | | 12 | 11,395.90 | 11,650.00 | +254.10 |

[1] Cost is of horses which were sold or which died, but does not include any amount for cost of horses foaled or selling costs.

At the close of 1935 the petitioner owned 13 horses which had cost $33,130.30 and 6 horses which had been foaled at the farm. The cost of the petitioner's fixed assets, including horses purchased, at the close of the year, as shown by his books was as follows:

1929_____ $132, 003. 46
1930_____ 199, 022. 49
1931_____ 224, 547. 33

The petitioner trained his horses, exhibited them at shows and advertised them. He instructed an accountant in his employ to open a set of books covering the operation of the farm. The accountant was engaged in other matters and did not actually open the books until 1930. Records were kept of all expenditures and income for the year 1929 and entries were made for 1929 when the books were opened. Thereafter, the books were regularly kept. Expenses were paid through a separate bank account. The following table shows the income, expenses and losses of the farm for the years involved.

|  | 1929 | 1930 | 1931 |
|---|---|---|---|
| Income | $1, 769. 22 | $8, 176. 26 | $13, 314. 19 |
| Expenses and losses | 22, 228. 68 | 48, 915. 19 | 54, 843. 53 |
| Net amount of losses | 20, 459. 46 | 40, 738. 93 | 41, 529. 34 |

Losses for later years were as follows:

1932 _____ $21, 192. 19
1933 _____ 27, 702. 95
1934 _____ 16, 844. 93
1935 _____ 12, 064. 11

The income included horse show prizes, amounts received for boarding horses, profits from sales of horses, and interest on the farm bank account. The operating expenses and losses were principally horse show expenses, stable expenses, pay roll, advertising, repairs, insurance, taxes, board paid for horses, and losses on sales of horses. The petitioner in his income tax returns claimed deductions for losses for 1929, 1930, and 1931 as shown above. The Commissioner disallowed the losses.

The farm was about three or four miles from the petitioner's home in Spring Lake, New Jersey. His son was in poor health and the petitioner decided in 1930 to build a home on the farm because he believed the location there would be better than Spring Lake for his son. He set aside 6 acres and completed a home thereon in 1931 at a cost of about $225,000.

The petitioner entered into the operation of the farm for profit and he operated the farm during the years 1929, 1930, and 1931 as a business with the intention of making a profit.

The Commissioner does not question the amount of the losses, but has determined that they are not deductible in computing the petitioner's income because the petitioner did not enter into the transaction and did not operate the farm during these years as a business for profit. The Commissioner contends that the petitioner operated the farm as a hobby or pastime for his own pleasure or amusement, rather than for the purpose of making a profit. The case must turn upon the intention of the petitioner. There is some evidence to support the Commissioner's determination. The petitioner was a rather wealthy man who had just retired from the business activity which had occupied most of his time, and it is possible that he operated the farm as a pastime and without the primary purpose of making a profit. The fact that there were losses during all of the years from 1929 to 1935, inclusive, is some evidence to indicate that the Commissioner was right. But the weight of the evidence is the other way. The farm was not used for social purposes nor was it a show place. It was operated in a business-like manner. The expenses were honest and legitimate expenses of conducting the farm upon a business-like basis. They were exclusive of any personal or living expenses of the petitioner. It appears that the depression was partly responsible for his failure to realize profits. Some of the losses came from the disposition of undesirable stock. He refused to sell some of his horses at a profit because he desired to retain and train those horses in his efforts to build up the reputation of his horses. This was all a part of his plan. He argues that he had to build up his business and the reputation of his farm for producing desirable horses before a failure to realize profits could be taken as a reasonably clear indication of failure. He testified that he entered into the transaction for profit, and during all of these years operated the farm with the hope and intention of realizing profit. A similar question has been dealt with in a number of cases. The deduction, when allowed, has been allowed on the basis of a finding that the transaction was entered into and carried on as a business with the expectation of a profit. Cf. *George D. Widener*, 8 B. T. A. 651; affd., 33 Fed. (2d) 833; *Margaret E. Amory*, 22 B. T. A. 1398; *James Clark et al., Executors*, 24 B. T. A. 1235; *Marshall Field*, 26 B. T. A. 116; affd., 67 Fed. (2d) 876. The showing made by this petitioner is at least as strong as that made by some of the petitioners in the foregoing cases. The Commissioner erred in disallowing these losses.

Reviewed by the Board.

*Decision will be entered under Rule 50.*