ESTATE OF BESSIE E. MACHRIS, DECEASED, CITIZENS NATIONAL TRUST & SAVINGS BANK OF LOS ANGELES, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69922. Filed August 11, 1960.

*William L. Kumler, Esq.*, for the petitioner.
*Marion Malone, Esq.*, for the respondent.

#### OPINION.

MURDOCK, *Judge:* The Commissioner determined a deficiency of $661.33 in income tax of Bessie E. Machris for 1954. The facts have been submitted by a stipulation which is adopted as the findings of fact. The only issue for decision is whether $1,537.98 paid by Bessie in 1954 was deductible under section 212 as nonbusiness expenses rather than deductible as a long-term capital loss.

Bessie filed an individual income tax return for 1954 with the district director of internal revenue at Los Angeles, California. She used the cash method.

Bessie and two others owning stock of the Wilshire Oil Company, Inc., entered into an agreement dated December 18, 1951, whereby they agreed to sell their stock to a purchaser described as "B-L and Associates, Inc." The parties agreed that the oil reserves under the Wilshire Oil Company, Inc., properties at that time amounted to 4,500,000 barrels, but they also recognized that the properties might contain additional oil reserves and they provided in the agreement that the sellers would be paid additional amounts for their stock upon any later determination of the existence of additional oil reserves in the property. They provided in this connection that an estimate would be made each year until October 1, 1961, to determine the existence of any additional oil reserves over the 4,500,-000 barrels. The purchaser agreed to pay to the sellers for their stock $1,090 per share in cash immediately and additional amounts when and if any subsequent annual estimate established the existence of reserves in the properties in excess of 4,500,000 barrels. Engineers were to be employed for the purpose of determining the amount of any additional reserves in any year if the parties could not agree on an amount for that year. The cost of obtaining such estimates was to be shared by the sellers and the buyer.

The agreement provided that the purchasers were to pay the sellers, in proportion to the stock purchased from each, an amount equivalent to 50 cents per barrel for all duly estimated oil reserves

over 4,500,000 barrels and up to 16,000,000 barrels. The purchaser deposited in escrow on December 18, 1951, $3,833,180 with the Chase National Bank of New York City for payment to the sellers as and if additional oil reserves might be determined to exist as provided in the agreement. This represented the sellers' shares of 50 cents per barrel for the first 11,500,000 barrels of possible estimated reserves over the 4,500,000 barrels.

The following table shows the payments received by Bessie for her Wilshire stock under the agreement of December 18, 1951, the cost of that stock, her expenditures in connection with the sale, including all amounts paid by her in determining additional proved oil reserves, and her gain from the sale which she reported for the years shown.

| Year | Purchase price received | Cost | Expenses of sale | Gain |
|---|---|---|---|---|
| 1951 | $9,083,129.80 | $1,985,327.83 | $55,928.01 | $7,041,873.96 |
| 1952 | 383,272.00 | (¹) | 20,600.38 | 362,671.62 |
| 1953 | 749,970.00 | (¹) | 23,777.86 | 726,192.14 |

¹ None.

An engineer was employed for the purpose of making an estimate to determine any additional reserves in 1954 and Bessie paid $1,537.98 in 1954 in that connection. The determination was that there were no reserves in addition to those previously determined. Bessie deducted the $1,537.98 on her 1954 return as an ordinary and necessary expense.

The Commissioner, in determining the deficiency, disallowed a deduction of $1,537.98 and allowed one-half thereof as a long-term capital loss with the following explanation:

(a) It is determined that the claimed legal and engineering expenses in the amount of $1,537.98 incurred in accordance with the specific terms of the contract of December 18, 1951, as amended, represent additional costs or expenses of sale of a capital asset and are subject to the provisions of sections 1201, 1202 and 1222 of the Internal Revenue Code of 1954, and it is further determined that said items are not ordinary and necessary expenses allowable under section 212 of the Internal Revenue Code of 1954.

It is apparent that the amount here in controversy was paid by Bessie in accordance with the agreement of December 18, 1951, in order to have a determination made, as required by that agreement of whether there were as of October 1, 1954, any additional reserves for which additional purchase price for the stock would be due. There was no dispute or contest between the parties and no resistance by the buyer, but on the contrary the buyer and seller were merely carrying out their agreement which made the purchase price depend upon whether or not additional reserves might be determined to exist from year to year. This expenditure, like the larger

ones made in previous years and reported as costs of the sale, was not in any true sense an ordinary and necessary expense, on the part of Bessie, for the production or collection of income. The money was not spent to produce any income or to collect any income. On the other hand, it was not spent in connection with the title to the stock which Bessie sold. Those matters entailed no expenditures.

This was an expenditure incurred in connection with the sale of the stock, deductible in computing any gain or loss from the sale of the stock. It was contemplated at the time the agreement was entered into that such expenditures might have to be made in order to determine how much additional purchase price for the stock, if any, would be due in each year up to October 1, 1961. This money, if it had been spent at the time the agreement was entered into in order to determine a fair estimate of the oil reserves, would have been subtracted from the "amount realized" in order to determine the "gain." Exactly the same principles apply to the spending of the money in 1954. The sale resulted in long-term capital gain to Bessie in 1951, 1952, and 1953, but she had no additional gain from the sale to report in 1954 from which the expenditure could be subtracted. Therefore, the Commissioner, in continuing to compute the long-term capital tax consequences from the sale on a yearly basis, was right in allowing the deduction of one-half of the expenditure as a long-term capital loss. Cf. *Arrowsmith* v. *Commissioner*, 344 U.S. 6, affirming 193 F. 2d 734, rehearing denied 344 U.S. 900.

The petitioner relies upon *Walter S. Heller*, 2 T.C. 371, affd. 147 F. 2d 376, certiorari denied 325 U.S. 868, and upon *Naylor* v. *Commissioner*, 203 F. 2d 346, reversing 17 T.C. 959. There was a lack of agreement in both of those cases between the parties to the sales, there was dispute as to the amount to be paid for the stock, there was litigation in progress in the one case and in both cases the expenditure sought to be deducted as an expense was related to the dispute and consisted of or included attorneys' fees. There are no such facts in the present case, and since the cases are thus distinguishable there is no need for further comment in regard to them.

*Decision will be entered for the respondent.*