PRIDEMARK, INC. (FORMERLY PREFAB HOMES AND SUPPLIERS, INC.), ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 93303–93307. Filed June 15, 1964.

[1] The following cases are consolidated herewith: Pridemark, Inc., of Connecticut, docket No. 93304; Eugene Blitz and Eleanor Blitz, docket No. 93305; Jules E. Blitz and Barbara J. Blitz, docket No. 93306; and Gershan K. Thiman and Joan G. Thiman, docket No. 93307.

*Jack C. Merriman*, for the petitioners.
*Stuart E. Seigel*, for the respondent.

PIERCE, *Judge:* These proceedings involve deficiencies in income tax determined by the Commissioner as follows:

| Docket No. | Taxable year ended | Petitioner | Deficiency |
|---|---|---|---|
| 93303 | Feb. 29, 1956 | Pridemark, Inc. (formerly Prefab Homes & Suppliers, Inc.) | $8,919.18 |
|  | Feb. 28, 1958 | ___do___ | 83,219.38 |
| 93304 | May 31, 1958 | Pridemark, Inc., of Connecticut | 12,298.81 |
| 93305 | Dec. 31, 1958 | Eugene Blitz and Eleanor Blitz | 38,406.77 |
| 93306 | Dec. 31, 1958 | Jules E. Blitz and Barbara J. Blitz | 1,974.54 |
| 93307 | Dec. 31, 1958 | Gershan K. Thiman and Joan G. Thiman | 1,846.43 |

All these cases were consolidated for trial.

Decision in docket No. 93303 respecting the fiscal period ended in 1956 will be deferred until the recomputation of tax under Rule 50. The issue for this 1956 period involves the amount deductible by Pridemark, Inc., as a net operating loss carryback from a subsequent taxable period; and such amount will depend on the outcome of other issues before us.

The issues to be here decided are:

Whether certain 1958 and 1959 transactions of Pridemark, Inc., Pridemark, Inc., of Connecticut, and their respective stockholders, effected complete liquidations of said corporations within the meaning of section 337 of the 1954 Code;[2] or whether such transactions were incidental to a reorganization of the continuing business enterprise.

[2] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.

Determination of this issue will provide the answer to two other underlying questions, to wit:

(a) Do the gains which said corporations realized from sales of certain assets during their taxable periods ended in 1958, qualify for nonrecognition for income tax purposes under section 337(a)?

(b) Do the distributions of cash which petitioners Eugene Blitz, Jules E. Blitz, and Gershan K. Thiman received from Pridemark, Inc., in 1958, qualify for capital gains treatment as liquidating dividends; or are these distributions taxable to them as ordinary dividends?

■ Irrespective of the applicability or nonapplicability of section 337:

(a) Whether gains which each of the above-named corporations realized from sales to another corporation of certain of their uncompleted customer contracts are taxable to said corporations as ordinary income; and

(b) Whether any part of the proceeds which Pridemark, Inc., received upon its disposition of said customer contracts was consideration for the sale of goodwill.

■ Whether the amounts of certain customer deposits, which the two corporations retained for their own benefit at the time they disposed of the customer contracts to which these deposits related, are includible in the taxable incomes of said corporations for their taxable years ended February 28, 1958, and May 31, 1958, respectively.

■ Whether legal fees which Pridemark, Inc., incurred in connection with its above-mentioned sale of miscellaneous assets, are deductible by said corporation as ordinary and necessary business expenses; or whether the amounts of these fees should be treated as an offsetting adjustment in computing its gains from said sale.

■ Whether Pridemark, Inc., is entitled to deduct for its taxable period ended on January 7, 1959,[3] any amounts paid as salaries to Eugene Blitz and Jules E. Blitz in excess of $8,700 and $5,590, respectively.

We shall hereinafter consider these several issues, consecutively.

### GENERAL FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and all exhibits identified therein are incorporated herein by reference.

Petitioner Pridemark, Inc. (hereinafter called Pridemark), is a dissolved Maryland corporation, which was organized in 1946 under the name of Prefab Homes and Suppliers, Inc. At all times relevant, it

---

[3] Said taxable period of Pridemark, Inc., is not one for which any deficiency was determined; but it is necessary for us to consider said period in determining the amount of the corporation's net operating loss carryback to its fiscal year ended in 1956 which is before us.

kept its books of account and filed its income tax returns on an accrual basis. Its income tax returns for all fiscal periods here involved were filed with the district director of internal revenue at Baltimore.

Petitioner Pridemark, Inc., of Connecticut (hereinafter called Connecticut) also is a dissolved corporation. It was organized in 1952 under the laws of Connecticut, with the name of Prefab Homes & Suppliers Corp. It kept its books of account on an accrual basis; and its income tax returns for all periods here involved were filed with the district director of internal revenue at Hartford.

The individual petitioners, Eugene and Eleanor Blitz, Jules E. and Barbara J. Blitz, and Gershan K. and Joan G. Thiman are, respectively, husbands and wives residing in Baltimore. Each of these couples filed a joint income tax return for the calendar year 1958 with the district director of internal revenue at Baltimore. The wives are parties to the present proceedings solely by reason of their having joined in the filing of said joint returns.

### Issue 1.  Background Facts

In about February 1946, petitioner Eugene Blitz and two other individuals named Jack Gottlieb and Leo Linton, organized a Maryland corporation, which was initially named Prefabricators, Inc., but which thereafter changed its name to Golden Key Homes, Inc. (Said corporation is hereinafter called Golden Key.) The three incorporators contributed capital of $3,000 each and became the sole and equal stockholders. The initial purpose of this corporation was to engage in the designing and manufacture of unassembled prefabricated houses, and to itself directly handle the sale of its products to prospective homeowners. However, in March 1946, which was shortly after the date of Golden Key's incorporation, the same three individuals organized (again as equal shareholders, and with capital of about $6,000 represented by 5,000 shares without nominal or par value) a second corporation to act as the exclusive dealer for Golden Key's products. This second corporation was petitioner Pridemark. Thereafter and until 1958, Golden Key centered its principal activities in designing and manufacturing prefabricated houses at a plant located in or near Baltimore; and in selling its products under contracts with separately incorporated dealers, such as Pridemark.

On about March 1, 1950, which was approximately 4 years after Golden Key and Pridemark had thus been organized, the three stockholders of these two corporations entered into an arrangement, under which Eugene Blitz transferred all his stock interest in Golden Key to his associates Jack Gottlieb and Leo Linton; and under which the two latter individuals at the same time transferred all their stock interests in Pridemark to Eugene Blitz. Thus, Eugene Blitz there-

upon became the sole stockholder of Pridemark. Also he became the president; his son, petitioner Jules E. Blitz, became the secretary and treasurer; and both of them, together with two other persons, became the directors.

At this same time and under date of February 28, 1950, Golden Key and Pridemark entered into a written dealership contract, under which Golden Key granted to Pridemark an exclusive and perpetual right to sell its unassembled prefabricated houses "throughout the United States and Canada and anywhere in the world," at prices to be established by Golden Key, less certain agreed discounts or commissions. Also under this contract, Pridemark agreed, among other things, to submit all its customer contracts and purchase orders to Golden Key for its acceptance or rejection; to purchase solely from Golden Key, all items called for in these customer orders; and to prepare and provide all catalogs or leaflets used in its sales work. Following the execution of this contract, Pridemark became (and continued for a time to be) the exclusive dealer for Golden Key prefabricated houses.

About 2 years later, on June 15, 1952, petitioner Eugene Blitz (the sole owner of Pridemark) caused petitioner Pridemark, Inc., of Connecticut to be incorporated; and thereafter this corporation acted as the exclusive dealer for Golden Key homes in the State of Connecticut. Also, shortly thereafter on a date not established in the evidence, Eugene Blitz caused still another corporation to be organized under the name of Crestline Homes Corp.; [4] and thereafter, Crestline also operated as a dealer for certain types of Golden Key homes. All three of said dealer corporations, including Pridemark, Connecticut, and Crestline, were controlled and principally owned by Eugene Blitz. All maintained their principal offices in the same premises, located at 29 West Biddle Street in Baltimore, Md.; and all of them directed their business activities and kept their accounting books and records at that place—utilizing the same officers and office employees.

Pridemark, as before stated, was incorporated in 1946 with capital stock of about $6,000; and Connecticut was incorporated in 1952 with capital stock of $5,000. Thereafter, both corporations operated successfully. In about December 1953, Pridemark increased its capitalization and issued to its employees 860 shares of nonvoting class A preferred stock of the par value of $10 per share. In 1956 it again increased its capitalization; and thereupon it issued to Eugene Blitz (its sole common stockholder) a stock dividend of 1,000 shares of nonvoting class B preferred stock, by transferring $100,000 from its earned surplus account to its class B preferred stock account.

---

[4] The Crestline Homes Corp. is not a party to this proceeding; and only few facts regarding it are revealed in the record herein.

The total gross receipts of Pridemark and Connecticut for their respective fiscal periods ended in 1955 through 1958 were:

| Year | Pridemark | Connecticut | Total |
|------|-----------|-------------|-------|
| 1955 | $2,235,780 | $540,464 | $2,776,244 |
| 1956 | 2,636,056 | 541,986 | 3,178,042 |
| 1957 | 2,047,795 | 545,521 | 2,593,316 |
| 1958 | 1,432,686 | 358,580 | 1,791,266 |

Summaries of the balance sheets of Pridemark and Connecticut, as of the close of their respective fiscal years ended on February 28, 1958, and on May 31, 1958, are as follows:

### ASSETS

| | Pridemark | Connecticut |
|------|-----------|-------------|
| Cash | $25,387.42 | $44,774.75 |
| Notes and accounts receivable, less reserve for bad debts | 342,684.96 | 66,227.86 |
| Inventories | | |
| Investment in another corporation | 6,800.00 | |
| Depreciable assets, less reserve for depreciation | 7,280.58 | |
| Land | 17,226.26 | |
| Other assets | 15,171.74 | |
| Total assets | 414,550.96 | 111,002.61 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | Pridemark | Connecticut |
|------|-----------|-------------|
| Accounts payable | 7,714.14 | 15,664.58 |
| Customer deposits | 31,764.03 | 4,062.16 |
| Bonds, notes, and mortgages with maturity of more than 1 year | 10,536.95 | |
| Accrued expenses | 32,178.87 | |
| Other liabilities | 6,129.48 | 6,174.46 |
| Capital stock | 112,600.00 | 8,167.00 |
| Earned surplus and undivided profits | [1] 213,627.49 | 76,934.41 |
| Total liabilities and stockholders' equity | 414,550.96 | 111,002.61 |

[1] The above-stated earned surplus of Pridemark should be increased by $100,000 to reflect the amount of its earned surplus available for taxable dividends, because of the above-mentioned transfer of said amount from its earned surplus account to its class B preferred stock account, in connection with the stock dividend issued to Eugene Blitz in 1956.

The only taxable dividends declared and paid by Pridemark and by Connecticut from their dates of incorporation to and including the close of their fiscal years ended in 1958, were as follows:

### PRIDEMARK

| Fiscal year ended | Common stock | Class A preferred | Class B preferred |
|-------------------|--------------|-------------------|-------------------|
| Feb. 28, 1955 | | $760.00 | |
| Feb. 29, 1956 | | 845.00 | |
| Feb. 28, 1957 | | 546.67 | $3,000 |
| Feb. 28, 1958 | | 656.00 | |

### CONNECTICUT

None

*Facts re Sales of Certain Assets to Golden Key by Pridemark and Connecticut; and re Alleged Liquidation of the Latter Corporations*

For several years prior to the beginning of the taxable periods involved in these proceedings, there were serious disagreements and disputes between Pridemark and Golden Key—arising over varied matters, including: The resale prices which Golden Key fixed for its prefabricated houses; and the comparative emphasis to be given in advertising, to the trade name "Golden Key Homes" on the one hand, and to the trade name "Pridemark Homes for Proud Living" on the other hand. During 1955 through 1958, these disagreements and disputes became more frequent and more severe. Accordingly in 1956 and 1957, Eugene Blitz expressed desires to sever his business relationship with Golden Key and to continue the businesses of his dealer corporations with a different manufacturer and supplier of prefabricated houses. Pridemark thereupon contacted various other manufacturers of prefabricated houses. Also in 1957, Pridemark and Golden Key each made an offer to the other to purchase the other's assets; but both of these offers were rejected.

Subsequently toward the end of 1957, a meeting was held between representatives of Pridemark and of Golden Key, which thereafter resulted in the execution on February 3, 1958, of a written agreement (Exhibit 17-N) for the purchase by Golden Key of certain customer contracts and miscellaneous assets of the three dealer corporations, which pertained particularly to the handling of Golden Key products. The relevant provisions of this agreement may be summarized as follows:

The parties to the agreement were: The three dealer corporations, Pridemark, Connecticut, and Crestline (called the sellers); Eugene Blitz, individually (described in the agreement as being the major stockholder of each of the sellers); Golden Key (called the buyer); and Jack Gottlieb and Leo Linton, individually (described as the sole stockholders of the buyer).

The sellers, after first reciting in general terms, that they agreed to sell to Golden Key "their entire business, as a going concern" (notwithstanding their subsequent exclusion of substantial assets, as hereinafter shown) then listed the specific assets to be sold, as follow:

All noncanceled customer contracts for the purchase of Golden Key and Crestline prefabricated houses, which were entered in the sellers' books on the settlement date, and on which no partial or completed deliveries to the customers had then been made.

All leases and leasehold improvements, including sales offices and sample houses, and all equipment, displays, models and furniture, and

sales offices of the sellers, located at 10 specified locations in Maryland, New York, New Jersey, and Connecticut; all sellers' customer lists and the files relating thereto; all lists of deposit customers, with the related architectural drawings; all files covering sales of houses manufactured by Golden Key; and catalogs and sale application forms used in selling Golden Key products.

Goodwill, including the rights theretofore granted by Golden Key to the sellers under their existing dealership contracts to use the trademarks or trade names, "Golden Key," "Golden Key Homes," and "Flex Plan."

*Expressly excluded* from the sale were the following assets owned by the sellers:

Leasehold improvements, models and displays, sales offices, equipment, furniture, and fixtures, situated at the sellers' home office (located at 29 West Biddle Street, Baltimore).

The lease covering the sales office located at said home office.

The option to purchase contained in the lease for the sales office located at Union, N.J.

Customer contracts on hand at date of settlement, on which the sellers had made partial deliveries to the customers.

Sellers' corporate names, "Pridemark" and "Crestline"; and also Pridemark's former name, "Prefab Homes & Suppliers, Inc."

Other assets reflected on the sellers' balance sheets, to wit:

> Cash
> Prepaid insurance and other prepaid expenses
> Cash surrender value of life insurance
> Land
> Automobiles and trucks
> Deposits with utility companies and landlords
> Stationery and supplies at home office
> Investments
> Notes, accounts, and loans receivable

The parties agreed on specific formulas for determining the separate purchase prices for: Those customer contracts which were to be sold; those leasehold improvements which were to be sold; and those leases which were to be assigned. Also, the parties agreed that the price to be paid for the goodwill to be sold would be $15,000.

The total purchase price to be paid by Golden Key for all items sold, was to be paid as follows: $74,000 in cash; with the balance of the purchase price to be evidenced by 27 promissory notes that would mature monthly over a period from March 1, 1958, through May 1, 1960—22 of which notes would be fully negotiable, and 5 of which would be nonnegotiable.

Sellers gave the buyer a right to negotiate with their executives and other employees for possible employment by buyer. And sellers agreed to limitations on their right to employ personnel of the buyer.

All dealer agreements existing between the sellers and buyer would be terminated as of the settlement date.

The settlement date would be on or before February 10, 1958.

On January 10, 1958, which was in the interval between the time of the above-mentioned meeting between representatives of Pridemark and Golden Key, and the time of execution of said agreement on February 3, 1958, special meetings were held by the boards of directors of Pridemark and Connecticut, at which said respective boards of directors adopted resolutions which in material part, read as follows:

RESOLVED: That the Board of Directors hereby declares the dissolution of the Corporation to be advisable and for the best interest of the Corporation.

  \*    \*    \*    \*    \*    \*    \*

RESOLVED: That the Directors be, and they are hereby authorized and directed for and on behalf of the Corporation to negotiate a favorable contract for the sale and liquidation of the Corporation's assets, to wind up the affairs of the Corporation and after satisfaction of all liabilities, to transfer all of the assets of the Corporation, in kind, to the Stockholders in complete cancellation and redemption of all the outstanding stock of the Corporation.

Written consents of the stockholders of Pridemark and of Connecticut were filed on January 13, 1958; and then Treasury Forms 966 were duly filed by Pridemark and Connecticut with the Internal Revenue Service.

The settlement between Golden Key and the sellers under their above-described sale agreement was effected on February 10, 1958. The total price then fixed for the particular assets sold, including both cash paid and promissory notes delivered, was $174,866. Of this amount, $134,400 was paid for uncompleted customer contracts which were not carried on the balance sheets of Pridemark or Connecticut; and only a relatively small portion of said sale price represented other miscellaneous assets used in the business of these corporations.

On January 10, 1958, when Pridemark's board of directors adopted the above-mentioned resolution for dissolution, the total shares of Pridemark's stock of all classes then issued and outstanding were held as follows:

| Stockholder | Number of shares held | | |
|---|---|---|---|
| | Common | Class A preferred | Class B preferred |
| Eugene Blitz, voting trustee for the benefit of: | | | |
| Eugene Blitz | 2,400 | | |
| Jules E. Blitz | 150 | | |
| Gershan K. Thiman | 150 | | |
| E. J. McCaffery | 150 | | |
| Bennett Linton | 150 | | |
| | 3,000 | | |
| F. B. Habercam | | 65 | |
| G. F. Nishino | | 30 | |
| E. J. McCaffery | | 80 | |
| J. W. Walsh | | 80 | |
| R. H. Dinges | | 65 | |
| I. Gordon | | 40 | |
| J. Lee | | 40 | |
| S. Hoffman | | 100 | |
| G. D. Thiman | | 50 | |
| B. Linton | | 100 | |
| Jules E. Blitz | | 100 | |
| P. Perron | | 10 | |
| | | 760 | |
| Eugene Blitz, individually | | | 1,000 |

The only class of Pridemark stock entitled to vote was the common stock.

The above 3,000 shares of common stock held in the name of "Eugene Blitz, voting trustee," represented all the common stock of Pridemark then issued and outstanding, which had originally been held by Eugene Blitz, individually. The instrument for such voting trust was executed on December 30, 1955; but at the time of the trial herein said instrument could not be found—so that neither the terms of the trust, nor the manner in which it was declared or otherwise created, have been established. However, a certificate (Exhibit M) which was issued thereunder on June 4, *1957*, by Eugene Blitz, voting trustee, to Bennett Linton in respect of 150 shares of common stock, reads in material part as follows:

This certifies that on the *29th day of December, 1965*, or upon the earlier termination of the Voting Trust Agreement hereinafter mentioned, pursuant to the terms of said Agreement, whichever shall first occur, BENNETT LINTON *will be entitled to receive a certificate or certificates expressed to be fully paid or non-assessable for 150 shares of the Common Stock* of Prefab Homes & Supplies, Inc. [former name of Pridemark], a corporation duly created, organized and existing under the laws of the State of Maryland, and, in the meantime, to receive payments equal to the dividends, if any, collected by the Voting Trustee upon a like number of said shares of stock; and, *until after the actual delivery of such certificates, the Voting Trustee shall, in respect of any and all such stock, possess and be entitled to exercise, except as otherwise expressly provided in the Agreement hereinafter mentioned, all Stockholders' rights of every kind, including the right to vote and to take part in or consent to any corporate or Stockholders' action, it being expressly stipulated that no right to vote*

*or to take part in or consent to any corporate or Stockholders' action passes by or under this certificate or by or under any agreement, express or implied.* [Emphasis supplied.]

As hereinabove found, Pridemark, at the time when its resolution to dissolve was adopted, had three classes of stock outstanding: 3,000 shares of common, held by Eugene Blitz as voting trustee; 1,000 shares of class B preferred, held by Eugene Blitz individually; and 760 shares of class A preferred, held by the various individuals above named. Thereafter at times not shown by the record, all the class A preferred was eliminated (apparently by redemption prior to July 1958)—thereby leaving Eugene Blitz as trustee and Eugene Blitz individually, as the sole stockholders of Pridemark.

Subsequently, at various dates from July 29, 1958, to December 17, 1958, cash distributions were made to some of the beneficiaries of the voting trust, including Eugene Blitz, Jules Blitz, and Gershan Thiman.[5]  Thereafter, under dates of January 5 and 7, 1959, the following three additional steps were taken:

(1) All of the 1,000 shares of class B preferred stock held by Eugene Blitz individually were retired, by payment of $127,167;

(2) All remaining assets of Pridemark (exclusive of $16,215.03, required for payment of creditors) were purportedly distributed in kind to five individuals who had formerly been the beneficiaries of the voting trust, to wit: Eugene Blitz, Jules E. Blitz, Gershan K. Thiman, E. J. McCaffery, and Bennett Linton; and

(3) All of these five distributees then, on the same date of January 7, 1959, became parties to a new declaration of trust (Exhibit S) under which they assigned to Eugene Blitz, as trustee, and under which Blitz declared and acknowledged that he held "in his sole name," all the assets of Pridemark (including among other things all the office furniture and fixtures located in the home office at 29 West Biddle Street, Baltimore) which had concurrently been distributed to or for such persons in purported liquidation of Pridemark; and also under which said distributees authorized Eugene Blitz, as trustee, to convert this property into cash or otherwise dispose of the same in his sole discretion as he might see fit to do.

As regards Connecticut, a similar plan was adopted.  On January 10, 1958 (the date of its resolution for dissolution), and also on January 7, 1959, all of its common stock which was the only class of stock issued and outstanding, was held as follows:

---

[5] The amounts distributed to the individual husband-petitioners by Pridemark in 1958 (as determined by the respondent and as shown by said petitioners on their returns) were as follows:

| | |
|---|---|
| Eugene Blitz | $86, 810. 00 |
| Jules Blitz | 10, 944. 18 |
| Gershan Thiman | 10, 438. 40 |

| Stockholder: | *Number of shares* |
|---|---|
| Eugene Blitz | 714 |
| Jules E. Blitz | 36 |
| Gershan K. Thiman | 36 |
| E. J. McCaffery | 36 |
| Bennett Linton | 36 |
| S. Hoffman | 36 |
| L. R. Goldfarb | 36 |
| B. Gallaghar | 36 |
| Total | 966 |

Under date of January 5, 1959, all its remaining assets (except $1,327 required to pay creditors) were distributed in kind to said eight stockholders. And then, almost simultaneously and under date of January 6, 1959, all these distributees (acting similarly and practically concurrently with the above-mentioned distributees of Pridemark) became parties to a second declaration of trust (Exhibit R), under which they assigned to Eugene Blitz, as trustee, all of their rights, title, and interest in the properties so distributed to them; and also under which Eugene Blitz, as trustee, declared and acknowledged that he held the same "in his sole name" and under authority from the beneficiaries to sell or otherwise dispose of these properties in his sole discretion as he might see fit to do.

The result of all the foregoing transactions was that on and after January 6 and 7, 1959, Eugene Blitz, as trustee under said two declarations of trust, held complete title and power of disposition over all the remaining assets of both Pridemark and Connecticut.

On February 26, 1959, articles of dissolution of Pridemark were filed with the State Department of Assessments and Taxation of Maryland. And on February 28, 1959, articles of dissolution of Connecticut were filed with the secretary of state of Connecticut.

*Facts re Incorporation and Operations of Pridemark Enterprises, Inc.*

In November 1958, which was prior to the time when Pridemark and Connecticut made the distributions of assets-in-kind to their respective stockholders, Eugene Blitz instructed attorneys to organize a new corporation under the name of Pridemark Enterprises, Inc. The articles of incorporation for this company were executed on November 26, 1958; and on January 2, 1959 (which preceded the dissolutions of Pridemark and Connecticut), the new company was duly incorporated under the laws of the State of Maryland, with total authorized capital of 5,000 shares of common stock without nominal or par value. (This new corporation is hereafter called Pridemark Enterprises.)

All shares of stock of Pridemark Enterprises were issued for cash; and all this cash was contributed by Eugene Blitz, as trustee under the

two previously mentioned declarations of trust (Exhibits R and S), as follows:

*1959*

| | |
|---|---:|
| Jan. 16 | $1, 000 |
| Mar. 2 | 4, 000 |
| Apr. 3 | 5, 000 |
| Apr. 23 | 5, 000 |
| May 7 | 5, 000 |
| June 22 | 6, 000 |
| Aug. 10 | 10, 000 |
| Aug. 27 | 2, 000 |
| Sept. 28 | 1, 000 |
| Total | 39, 000 |

In addition to the above cash which represented 100 percent of the initial capital of Pridemark Enterprises, there also was assigned to this new corporation (as petitioners have conceded in their principal brief) the lease for the home office at 29 West Biddle Street in Baltimore, and the right to the name "Pridemark." All of these items, including said cash, were assets that Pridemark and Connecticut had specifically retained out of their previous sale of miscellaneous assets to Golden Key at the time they terminated their dealership relationship with that company; which they had thereafter purported to distribute in liquidation to their stockholders; and which these stockholders had then concurrently assigned to Eugene Blitz, as trustee of the two above-mentioned asset-trusts, for disposition by him in his sole discretion as he might see fit.[6]

The officers and members of the board of directors of Pridemark Enterprises, and the periods during which they served after the time of the first organization meeting, were:

Officers:
Gershan K. Thiman, president, Jan. 14, 1959, to present.
S. Hoffman, vice president, Jan. 14, 1959, to Apr. 4, 1960.
Eugene Blitz, secretary, Jan. 14, 1959, to present.
Jules E. Blitz, treasurer, Jan. 14, 1959, to present.
Directors:
Eugene Blitz, Jan. 2, 1959, to present.
Jules E. Blitz, Jan. 2, 1959, to present.
Gershan K. Thiman, Jan. 2, 1959, to present.
S. Hoffman, Jan. 14, 1959, to Apr. 4, 1960.

All of these persons were former stockholders and purported distributees of Pridemark or Connecticut.

---

[6] As we have previously found, the furniture and fixtures in the home office and various other operating assets of Pridemark and Connecticut that were retained out of their sale to Golden Key, also were included in the purported distributions-in-kind to stockholders; and all the assets so purportedly distributed were concurrently assigned to Eugene Blitz, as trustee of the two above-mentioned asset-trusts. The record is silent as to whether or not Pridemark Enterprises eventually acquired such additional assets.

The result of all the foregoing was that immediately or shortly following the completion of the organization of Pridemark Enterprises, Eugene Blitz, as trustee-assignee of 100 percent of the assets which Pridemark and Connecticut had purportedly distributed in kind, reassigned portions of these same assets to Pridemark Enterprises for 100 percent of the latter's initial capital stock; and also that all the officers and directors of said new corporation were persons who had participated not only in said distributions-in-kind, but also had participated in the creation of said asset-trusts held by Eugene Blitz, as trustee.

Approximately 1 year to 1½ years subsequent to the various dates on which Eugene Blitz, as trustee, had contributed the said $39,000 cash to Pridemark Enterprises for all its capital stock, he, in consideration of said contributions, caused the shares of Pridemark Enterprises to be issued to the following persons on the following dates:

| Stockholder | Number of shares | Date of acquisition |
|---|---|---|
| | | *1960* |
| Eugene Blitz | 2,379 | Aug. 1 and Sept. 29. |
| Jules E. Blitz | 390 | Aug. 1 and Sept. 29. |
| Gershan K. Thiman | 390 | Aug. 1 and Sept. 29. |
| E. J. McCaffery | 390 | Aug. 1 and Sept. 29. |
| Philip Perron (an employee) | 195 | Aug. 1 and Sept. 29. |
| Samuel Hoffman | 156 | Aug. 1 and Sept. 29. |
| Total | 3,900 | |

As regards the previously mentioned Pridemark, Inc. (to be distinguished from the new corporation called Pridemark Enterprises), it continued to occupy the home office located at 29 West Biddle Street in Baltimore, until December 1958; and it there engaged, among other things, in the following activities: For several months after February 1958, signs referring to Pridemark, Inc., and Golden Key Homes continued to be displayed on the exterior of the home office building; and when customers came in, Pridemark sold them homes under an arrangement whereby Golden Key paid it a commission, similar to that which it would have paid to any other distributor or agent. At least five prefabricated homes were sold under this arrangement. Also during this same period, both Pridemark and Connecticut continued to make deliveries of materials, render services, and handle collections in respect of those customer contracts which they had expressly reserved to themselves out of the above-mentioned transfer of miscellaneous assets to Golden Key—until these contracts were fully consummated by the final deliveries in November 1958.

In the meantime, in October or November 1958, Pridemark commenced negotiations with Hilco Homes (a manufacturer of prefabricated houses similar to those which previously had been supplied by Golden Key) seeking an arrangement whereby Hilco might there-

after supply it with prefabricated houses. On December 23, 1958, Pridemark (acting through Eugene Blitz), forwarded a letter to Hilco, which read in material part as follows:

December 23, 1958.

Attn: Mr. Matthews.
HILCO HOMES,
*70th Street off Essington Ave.,*
*Philadelphia 42, Pa.*

DEAR MR. MATTHEWS: Pursuant to our 'phone conversation of even date, we are expecting you at our offices in Baltimore on Tuesday, December 30th, sometime between 10 a.m. and 11 a.m.

Please be prepared to discuss prices to the extent of changes from your specifications to ours, etc.

We would also like you to bring with you, if possible, prices of garages * * *.

We are most anxious to get a low figure on garages, as we feel that there is a very good market for a low priced garage, and this item could be sold in quantities.

We are also very anxious to set up a catalog for summer cottages. * * *

    *         *         *         *         *         *         *

If you need additional clarification on this, please look at the specifications outlined in our Crestline booklet which we are sending you enclosed.

Please talk to Mr. Drucker, to be sure that you have all the pertinent facts in your mind *so that we may be able to establish a price setup under which we may be able to proceed with the setting up of our new catalog.*

Your cooperation will be greatly appreciated.

    Very truly yours,

PRIDEMARK, INC.
(S)   Eugene Blitz,
    EUGENE BLITZ.

[Emphasis supplied.]

Also on January 9, 1959, which was prior to the filing of articles of dissolution by Pridemark and Connecticut, Pridemark (again acting through Eugene Blitz) sent another letter to Hilco Homes, that read:

JANUARY 9, 1959.

Attn: Mr. Daniel M. Gurst.
HILCO HOMES,
*70th Street off Essington Ave.,*
*Philadelphia 42, Pa.*

DEAR MR. GURST: I am enclosing herewith my personal net worth statement, as of January 1, 1959. I believe that you will find that this statement is self-explanatory; but in the event that you have any questions at all, please do not hesitate to contact me.

Regarding the progress that is being made on this proposition, *we have contacted an architect who has already submitted a revised version of the Cape Cod model, and we anticipate receiving the other plans very shortly.*

Incidentally, *our present plan calls for selling these houses out of a newly formed corporation, Pridemark Enterprises, Inc., in which our initial cash investment will be $25,000.* Additional money will, of course, be available.

We were wondering whether you have given any thought to the *type of agreement that we would work under.* We would appreciate having your comments on this.

Incidentally, *we are waiting for some prices from you on summer cottages and garages.* Please let us hear from you just as soon as possible.

Very truly yours,

PRIDEMARK, INC.,

(S)   Eugene Blitz,

EUGENE BLITZ.

[Emphasis supplied.]

Thereafter on February 9, 1959 (which also preceded the final dissolutions of Pridemark and Connecticut), Pridemark Enterprises executed an agreement with Hilco Homes, under which the former became and has at all times since continued to be, a dealer for Hilco Homes in selling the latter's prefabricated houses in the States of Maryland, Connecticut, and New York. This dealership agreement was executed solely by Eugene Blitz over the name of Pridemark Enterprises, without designation by Blitz of any corporate capacity (he was then secretary of Pridemark Enterprises, and not an executive officer). Neither the signature of any other officer of Pridemark Enterprises nor the corporate seal of said corporation was affixed.

The prefabricated houses which Pridemark Enterprises thereafter sold to customers were exclusively those manufactured by Hilco Homes; and in general, these houses were similar in character to those which Golden Key previously had supplied to Pridemark and Connecticut. These Hilco houses were sold to customers by Pridemark Enterprises under the trade names "Pridemark" and "Pridemark Homes for Proud Living"—which trade names were identical with those which Pridemark and Connecticut had theretofore employed, and which the latter corporations had expressly excluded from their sale of assets to Golden Key on February 10, 1958. The trade name "Pridemark Homes for Proud Living," also was prominently displayed by Pridemark Enterprises, both at the top of its office stationery and in the catalogs which it supplied to prospective customers. In addition, the trade name "Pridemark Homes" was used by Pridemark Enterprises in its newspaper advertising.

From the inception of the business of Pridemark Enterprises, Eugene Blitz personally guaranteed the debts of that corporation to Hilco Homes; and his guaranteeing of such accounts was still being employed at the time of the trial herein.

The following is a list of persons previously employed by Pridemark and Connecticut, who were thereafter employed by Pridemark Enterprises:

| Name: | *Employment by Pridemark Enterprises* |
|---|---|
| Eugene Blitz | From incorporation to the present. |
| Jules E. Blitz | From incorporation to the present. |
| Gershan K. Thiman | From incorporation to the present. |
| Samuel Hoffman | From incorporation to July 1, 1960. |
| Philip Perron | From May 1959 to the present. |
| Edward McCaffery | From March 1960 to Dec. 3, 1960. |
| Virginia Wrender | From August 1961 to the present. |
| Greg Nishino | From February 1962 to the present. |

The gross receipts of Pridemark Enterprises for the calendar years 1959 through 1962 were as follows:

| | |
|---|---|
| 1959 | $295, 614. 81 |
| 1960 | 772, 032. 12 |
| 1961 | 884, 019. 63 |
| 1962 | 835, 403. 98 |

Pridemark Enterprises has neither declared nor paid any dividend since its incorporation.

The Commissioner, in his notices of deficiency herein, determined that neither Pridemark nor Connecticut qualified as a corporation that had been completely liquidated within the meaning of section 337 of the 1954 Code.

As regards the individual petitioners, the Commissioner determined that the amounts distributed to them by Pridemark in 1958 were taxable as ordinary dividends.

## OPINION RE ISSUE 1

The first and principal issue in this case, is whether the 1958 and 1959 transactions of the Pridemark and Connecticut corporations and their stockholders, which we have described at considerable length in our Findings of Fact, actually effected *complete liquidations* of said corporations within the meaning of section 337 of the 1954 Code—or whether these transactions were merely incidental to a *reorganization* of the continuing business enterprise, which was thereafter carried on through use of a newly organized corporate entity (i.e., Pridemark Enterprises) with both continuity of ownership and continuity in the field of business activity.

The contentions of the Commissioner (which the petitioners wholly dispute) are in substance:

(a) That neither Pridemark nor Connecticut was completely liquidated within the meaning of section 337—because 100 percent of the operating assets which they *in form* distributed to their stockholders in kind, were actually and immediately placed under the ownership and complete discretionary control of an intermediary (i.e., Eugene Blitz, as trustee); and because this intermediary, prior to the dissolution of Pridemark and Connecticut, then organized a new corporate entity of which he acquired 100 percent of the stock, and caused such entity to employ essential portions of these assets in continuing the business enterprise;

(b) That the legal effect of said transactions was not only to prevent the purported "liquidations" from being "complete"—which completeness is an essential prerequisite to the application of section 337; but also to constitute a "reorganization" of the business enterprise within the meaning of paragraphs (E) and (F) of section 368(a)(1) of the 1954 Code; and

(c) That the further effects of said transactions were that the gains which the petitioner corporations realized from the disposition of certain assets in February 1958 are to be recognized; and that the cash amounts distributed to the Pridemark stockholders in 1958 are taxable as ordinary dividends.

The material provisions of the above-mentioned sections of the Code are set forth in the margin.[7]

We are impelled to conclude, after examining the pertinent statutes and judicial authorities, and also after considering and weighing all the pertinent evidence herein, that there was no *complete* liquidation of Pridemark and Connecticut within the meaning of section 337; that there was a *reorganization* within the meaning of section 368 (a) (1) (F);[8] and that not only should the above-mentioned gains be recognized, but also that the above-mentioned cash distributions should be taxed as ordinary dividends. Our principal reasons for these conclusions are as follows:

1. Section 337 provides, in substance, that if a corporation distributes *all* its assets in *complete liquidation* within 12 months after the adoption of a plan of liquidation, then no gain or loss shall be recognized at the corporate level from sales of property during said 12-month period. And it further provides that if there is such a complete liquidation, the amounts distributed to shareholders are subject to capital gains treatment under section 331(a) (1) of the 1954 Code, and are not taxable as ordinary dividends.

---

[7] Internal Revenue Code of 1954.

SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan,

all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims.

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part [which parts are entitled respectively, "Distributions by Corporations," "Corporate Liquidations," and "Corporate Organizations and Reorganizations"], the term "reorganization" means [among other things]—

* * * * * * *

(E) a recapitalization; or

(F) a mere change in identity, form, or place of organization, however effected.

[8] In *Helvering* v. *Southwest Corp.*, 315 U.S. 194, 202, the Supreme Court stated that the term "recapitalization" was meant to comprise "a reshuffling of a capital structure within the framework of an existing corporation." This may mean that the term "recapitalization" is not applicable where a successor corporation is the vehicle for carrying on a continuing business enterprise. On the other hand, the Internal Revenue Service has, in Rev. Rul. 61–1956, 1961–2 C.B. 62, taken the position that pars. (E) and (F) may be applied concurrently, where the business is reorganized through use of a successor corporation.

In the instant case, we deem it unnecessary to resolve this problem; and we shall confine our consideration to the application of par. (F).

Whether or not *all* the assets are actually distributed in *complete liquidation* within the meaning of section 337 is to be determined from a consideration of all the pertinent facts and circumstances of the particular case at hand. It is well established that a *technical* liquidation of a corporation may be merely a step that is incidental to a statutory reorganization. See, for example, *Survaunt* v. *Commissioner*, 162 F. 2d 753, affirming 5 T.C. 665; *Liddon* v. *Commissioner*, 230 F. 2d 304, modifying on other grounds 22 T.C. 1220, certiorari denied 352 U.S. 824 (1956); *Pebble Springs Distilling Co.* v. *Commissioner*, 231 F. 2d 288 (C.A. 7), affirming 23 T.C. 196, certiorari denied 352 U.S. 836 (1956); *Lewis* v. *Commissioner*, 176 F. 2d 646 (C.A. 1), affirming 10 T.C. 1080; *Love* v. *Commissioner*, 113 F. 2d 236 (C.A. 3), affirming 39 B. T. A. 172; *Estate of Elsie W. Hill*, 10 T.C. 1090 (1948); *Becher* v. *Commissioner*, 221 F. 2d 252 (C.A. 2), affirming 22 T.C. 932; *Bard-Parker Co.*, 18 T.C. 1255 (1952), affd. 218 F. 2d 52 (C.A. 2), certiorari denied 349 U.S. 906 (1955). Also, this same principle has been adopted by the Treasury in section 1.331–1(c), Income Tax Regs., wherein it is stated:

Sec. 1.331–1 Corporate Liquidations.

(c) A liquidation which is followed by a transfer to another corporation of all or part of the assets of the liquidating corporation or which is preceded by such a transfer may, however, have the effect of the distribution of a dividend or of a transaction in which no loss is recognized and gain is recognized only to the extent of "other property." * * *

It is not necessary that the plan of reorganization be embodied in a formal written agreement. *Pebble Springs Distilling Co.* v. *Commissioner*, *supra; Ethel K. Lesser*, 26 T.C. 306.

In order to determine whether a reorganization has been effected, it is appropriate and necessary that all parts of the transaction be considered together, rather than separately. *Bard-Parker, Liddon, Survaunt*, and *Lesser* cases, all *supra*.

Even in a situation where a complete liquidation was initially intended for the purpose of winding up a business, if later conditions prompted the creation of a new corporate entity to carry on the same business with substantially the same ownership, a reorganization may be effected. *Morley Cypress Trust, Schedule "B."*, 3 T.C. 84. Also, the fact that assets are conveyed indirectly from the old corporation to the new corporation through use of an intermediary, does not preclude a reorganization. *Lyon, Inc.* v. *Commissioner*, 127 F. 2d 210 (C.A. 6), affirming 42 B.T.A. 1094.

As was stated in *Lewis* v. *Commissioner*, *supra* at 648–649:

"the essence of [a statutory reorganization] is a continuance of the proprietary interests in the continuing enterprise under modified corporate form, the transaction being deemed insufficiently closed economically to justify a tax at the time, except in so far as the stockholder gets something in addition to stock or securities in the reorganized company." * * *

*     *     *     `     *     *     *

The liquidation of the old company does not change matters because a statutory reorganization may encompass as one of its incidents the liquidation of one of the corporations a party to the reorganization. * * *

Congress has defined six types of transactions which qualify as "reorganizations." See sec. 368 (a)(1) (A) through (F). And the one of these which may be applicable in a given case depends, here again, on the particular facts and circumstances involved. One of the most broadly phrased of said definitions is that specified in paragraph (F), which comprehends "a mere change in identity, form, or place of organization, however effected."

2. Applying the foregoing principles in the instant case, we find that what actually happened here was this.

Up until approximately the end of the year 1957, Pridemark and Connecticut, together with their smaller sister corporation Crestline— all of which were principally owned and controlled by Eugene Blitz— operated as exclusive dealers for prefabricated houses that were manufactured and supplied to them by Golden Key. During the last 2 years of this arrangement, increasing friction and disputes developed between these dealers and their supplier, with the result that Eugene Blitz indicated a desire to terminate the arrangement with Golden Key and to continue the business with a new supplier. The final result was that, at the end of 1957, a meeting was held between representatives of the Blitz corporations and of Golden Key, which resulted in the execution of an agreement on February 3, 1958, under which all dealership agreements existing between Golden Key and the Blitz corporations were to be terminated; and also under which certain assets of the Blitz corporations which related to operation under said dealership agreements, were sold. In the interval between the date on which the arrangement for this sale was made and the time when it was actually consummated, both Pridemark and Connecticut adopted resolutions to liquidate and dissolve. The total sale price of the assets transferred to Golden Key was about $174,400, of which about $134,400 was paid for certain customer contracts that were not carried in the balance sheet of either corporation; and relatively few balance-sheet items were included. The total assets carried on the balance sheets of Pridemark and Connecticut, as of the close of their respective fiscal years ended in February and May 1958, were approximately $414,000 and $111,000—or a total of approximately $525,000.

During the remaining portion of the year 1958, Pridemark eliminated all of its 760 shares of class A preferred stock; and it also during said period made cash distributions to its stockholders in the aggregate amount of approximately $108,000, of which approximately $107,000 went to Eugene Blitz, Jules Blitz, and Gershan Thiman. Thereafter, on or about January 7, 1959, all the remaining assets of both Pridemark and Connecticut were purportedly distributed to the

stockholders in kind (in the manner and circumstances hereinafter discussed) ; and these two corporations were dissolved at the end of February 1959.

In October and November 1958 (which was prior to the time when Pridemark and Connecticut distributed most of their assets), Pridemark commenced negotiations with Hilco, a manufacturer of prefabricated houses, seeking an arrangement whereby Hilco (instead of Golden Key) would supply houses for sale by Pridemark. Thereafter, as shown in letters written by Eugene Blitz in December 1958 and January 1959, which we have set forth in our Findings of Fact, Pridemark clearly indicated an intention to continue in the prefabricated house business, to set up new catalogs, and thereafter to sell these houses through a newly formed corporation, Pridemark Enterprises, Inc. In the above-mentioned January letter, it said:

Incidentally, our present plan calls for selling these houses out of a newly formed corporation, Pridemark Enterprises, Inc., in which our initial cash investment will be $25,000. Additional money will, of course, be available.

Arrangements for the creation of said newly formed corporation, Pridemark Enterprises, were made with attorneys in November 1958; the articles of incorporation therefor were executed on November 26, 1958; and the company was actually incorporated on January 2, 1959. All of these events preceded the final distributions of Pridemark and Connecticut.

As heretofore stated, the remaining assets of Pridemark and Connecticut (valued at about $284,000) were in form distributed in kind to the stockholders of these companies, under dates of January 5 and 7, 1959; and on approximately these same dates, said stockholders reassigned all the same in kind to Eugene Blitz, as trustee, under two separate declarations of trust, whereby he was given not only complete title but also complete discretionary control over the disposition of said assets. Thereafter at various dates from January 16 to September 28, 1959, Eugene Blitz utilized $39,000 out of the assets of these trusts to purchase 100 percent of all the issued and outstanding stock of the new company, Pridemark Enterprises. Also, on September 28, 1959, Eugene Blitz assigned to Pridemark Enterprises the lease for the home office at 29 West Biddle Street in Baltimore, which Pridemark and Connecticut had theretofore used as their principal offices. And at about the same time (on a date not established by the record) Eugene Blitz transferred to this new company (out of said trust assets) the trade name "Pridemark" and the business slogan "Pridemark Homes for Proud Living," which had theretofore been utilized by Pridemark and Connecticut. Since neither of said prior companies had any inventories, the above-mentioned cash and nonphysical assets so transferred, represented the principal facilities with which the business enterprise had theretofore and was thereafter conducted.

Pridemark Enterprises from then on sold prefabricated houses supplied to it by Hilco, which were similar to those which Pridemark and Connecticut had previously obtained from Golden Key. All of this new corporation's initial assets were those which had formerly been used in the operation of the two predecessor companies. Immediately before the transfer of said assets, 100 percent interest therein was held by Eugene Blitz as trustee; and immediately after the transfer 100 percent of the stock of the new corporation likewise was owned by him as trustee. And also as regards the equitable ownership of said assets and said stock, both before and immediately after said transactions, all of the same belonged to those persons who had purportedly received the distributions in kind from Pridemark and Connecticut and who had then concurrently assigned the same to Eugene Blitz as trustee, for disposition thereof as he in his sole discretion saw fit to do.

3. Based on all the foregoing, we conclude and here hold:

That the net effect of the 1958 and 1959 transactions of Pridemark and Connecticut and their stockholders, was first to eliminate the unsatisfactory dealership relation with Golden Key, and then to continue the business enterprise with a new manufacturing supplier under a modified corporate form through Pridemark Enterprises, with both continuity of ownership and continuity in the field of business activity;

That there was no true intention to completely wind up and discontinue the business enterprise in which Pridemark and Connecticut had long engaged;

That the principal purpose of the 1958 and 1959 transactions was to siphon off most of the large accumulated earned surpluses of Pridemark and Connecticut, which had resulted from their failure to declare any taxable dividends except on the preferred stock of Pridemark, during the entire periods of their existence. The amount of the earned surplus of Pridemark available for taxable dividends, as of the close of its fiscal year ended February 28, 1958, was $313,627.49; and the amount of the earned surplus of Connecticut, as of the close of its fiscal year ended May 31, 1958, was $76,934.41. No substantial portion of these amounts of earned surplus, totaling over $390,500, was needed in the continuing business, which was in effect a service business that carried no inventories and did not require substantial investments in fixed assets. The essential operating assets of the business—which included all the cash that was paid into Pridemark Enterprises, the trade name "Pridemark" and the business slogan "Pridemark Homes for Proud Living," the lease for the home office at 29 West Biddle Street in Baltimore, and the experienced personnel—were all carried over to the new corporation; and were by it fully utilized in its continuation of the business; and

That the above-mentioned transactions clearly fall within both the letter and the intent of section 368(a) (1) (F) of the 1954 Code, in that they constituted a "mere change in identity, form, or [in the case of Connecticut] place of organization, however effected."

We further hold that the gains which Pridemark and Connecticut realized from sales of certain of their assets to Golden Key during their taxable years ended in 1958, must be recognized; and that the cash distributions made during 1958 by Pridemark to the individual petitioners Eugene Blitz, Jules Blitz, and Gershan Thiman are taxable as ordinary dividends, as determined by the Commissioner in his notices of deficiency.

*Issue 2—Re Gains of Pridemark and Connecticut From Sale of Uncompleted Customer Contracts to Golden Key*

FINDINGS OF FACT

The corporations Pridemark, Connecticut, and Crestline, in their written agreement with Golden Key of February 3, 1958 (which agreement is hereinabove described in our Findings of Fact for Issue 1), agreed not only to terminate their dealership arrangements with Golden Key, but also to sell to that corporation certain assets that pertained particularly to the handling of Golden Key's products. Among the assets so sold were the following:

(1) All non-cancelled contracts for the purchase of "Golden Key" and "Crestline" prefabricated houses to be manufactured by the Buyer and accessories thereto, under which *no deliveries had been made* on Seller's books at settlement date, together with the obligations to perform the same. [Emphasis supplied.]

Also in said agreement, the parties further agreed that there would be excluded from the sale (and be retained by the sellers) various other items, including:

(4) Contracts [of the Sellers] on hand at settlement on which Sellers *shall have made any deliveries;* i.e., delivery of the shell of the house or interiors. [Emphasis supplied.]

On the above-mentioned settlement date, which was February 10, 1958, Pridemark and Connecticut had on hand a total of 1,156 customer contracts. Of these 46 were contracts on which partial deliveries to customers had been made; and accordingly none of these particular contracts was sold or transferred to Golden Key. All the remaining contracts however, consisting of 1,108 contracts under which no materials for houses had been delivered, were sold and assigned to Golden Key together with part (but not all) of the customer deposits which had been received in connection therewith. The 1,108 customer contracts thus sold and assigned included:

850 uncompleted contracts which were in "inactive" status, in that no contact with the customers had been had for some time; and

258 uncompleted contracts which were in "active" status, in that it was anticipated that a substantial portion of these would be consummated by delivery of houses.

The total price which Golden Key, at the time of the settlement, paid to Pridemark and Connecticut for all of said 1,108 uncompleted customer contracts was $134,400. This price was computed by the parties in accordance with a formula embodied in said agreement of February 3, 1958, which was based on estimating the number of said contracts under which deliveries might ultimately be made. The manner in which this formula was applied, was as follows:

1. It was first estimated on the basis of the past experience of Pridemark and Connecticut, that at least 91 of all the customer contracts sold would result in deliveries of homes; and it further was estimated that the average price of each home delivered under any of the contracts would be $6,000.

2. It then was agreed by the parties that, for said group of 91 unidentified contracts that was estimated to be most likely to be consummated by deliveries of houses, Golden Key would pay to Pridemark and Connecticut, 20 percent of said estimated average contract price per house of $6,000 (i.e., 20% of $6,000=$1,200×91), or a total of $109,200. This rate of 20 percent was used instead of the normal 22 percent dealer commission or discount which Pridemark and Connecticut would have been entitled to receive, if their dealership arrangements with Golden Key had not been terminated and they had continued to retain the contracts until final consummation thereof.

3. It thereupon was recognized by the parties that some portion of the other 1,108 contracts sold (exclusive of said 91 above-mentioned contracts) might also result in the delivery of houses; and therefore an additional amount of $25,200 was added to the previously mentioned amount of $109,200. This additional amount of $25,200 is exactly equal to 20 percent of the estimated average price of $6,000 per house, under 21 additional unidentified contracts.

4. The result of all the foregoing was that the said aggregate price of $134,400 which Golden Key paid to Pridemark and Connecticut for all the 1,108 uncompleted contracts sold, equaled the sum of the two above-mentioned amounts of $109,200 and $25,200.[9]

---

[9] There is a conflict in the testimony presented herein as to whether said additional amount of $25,200, which was included in the total price of $134,400 paid, represented payment for a portion of the 1,108 uncompleted contracts sold; or whether, to the contrary, it was paid for goodwill. Respondent's witness Atkinson, who was vice president and comptroller of Golden Key and who personally participated at the settlement conference in determining the price which his company paid for the 1,108 uncompleted con-

As regards the customer deposits which Pridemark and Connecticut had theretofore received in respect of said 1,108 uncompleted contracts that they sold and assigned, only a portion (but not all) of these deposits was delivered to Golden Key; and the balance thereof was retained by said dealer corporations. The amounts of the deposits delivered were: $18,899 deposits on contracts sold by Pridemark; and $4,725 deposits on contracts sold by Connecticut.

Pridemark and Connecticut each kept its accounts and reported its income on an accrual basis; but neither of these corporations had at any time prior to the sale, accrued or included in income, any of the sales prices or any of the deposits received from customers, in respect of any of the 1,108 uncompleted contracts which they sold to Golden Key.

The manner in which Pridemark and Connecticut obtained their customer contracts, and also the nature of the services performed in connection therewith, were as follows. Both Pridemark and Connecticut had, prior to the termination of their dealership arrangements with Golden Key, operated as exclusive dealers for the sale of prefabricated houses which Golden Key manufactured. Under said dealership arrangements, they maintained in common, the home office and salesrooms located at 29 West Biddle Street, Baltimore, and also other sales offices in the various outlying localities. Also, they handled their own advertising; printed their own catalogs and sales literature; employed their own salesmen and office personnel; and solicited business from potential purchasers of prefabricated houses.

After a customer had been found, the particular dealer corporation involved had him execute a printed form of sale contract, and also received from him a deposit which normally ranged in amount up to $500. If the sale contract was thereafter consummated by delivery of the house, the amount of this deposit would be credited against the total sale price; and in the event that the contract was not so consummated, such deposit might either be forfeited to the dealer or be voluntarily refunded to the customer, depending on the particular circumstances of the noncompletion of the contract.

---

tracts, testified that said $25,200 was paid because of "the possibility that contracts in excess of the amount [for the most promising group of 91 contracts] estimated to be deliverable might actually be delivered." Also the settlement memorandum (Exhibit 29–X) which was prepared by the parties to reflect the agreed price for each of the separate items dealt with in the settlement of Feb. 10, 1958, specifically shows: "Price for contracts (per agreement 2/3/58)—$134,400"; and as the price for another separate and additional item, "Goodwill $15,000."

Petitioner Thiman testified, on the other hand, that said amount of $25,200 was paid for goodwill, in addition to the other separately listed amount of $15,000 for goodwill.

We have concluded, after seeing and hearing each of these witnesses testify and after considering and weighing all the relevant evidence, that this conflict of testimony should be resolved by determining, and finding a fact as we have done above, that all of said amount of $134,400 (including said item of $25,200) was paid by Golden Key and received by Pridemark and Connecticut as the total price for all the 1,108 uncompleted contracts that were sold ; and that no portion of said amount was paid for goodwill.

Under the terms of each of these customer contracts, which are typical of those here involved, the dealer (Pridemark or Connecticut, as the case might be) was not obligated to deliver any of the materials for the prefabricated house until after the customer had met all of the following conditions:

(1) He first had to make suitable arrangements with a bank or other lending institution to borrow an amount sufficient to cover both the cost of the house as reflected in the contract with the dealer corporation, and also the cost of erecting the house at his own expense;

(2) He had to obtain a clear title to the land on which the house was to be erected;

(3) He had to arrange for compliance with local building and zoning regulations; and

(4) He had to make arrangements with a contractor to erect the house; and also satisfactorily complete the construction of the foundation before the time when first delivery of materials was to be made.

After the customer signed the contract, the salesman of Pridemark or Connecticut (as the case might be) would forward the contract to the home office in Baltimore, with a request that the building plans be prepared. And thereafter the salesman would assist the customer in meeting the above-mentioned conditions precedent, including the making of arrangements for the financing and the obtaining of a contractor to install the foundation and erect the house.

After all said conditions had been met, Pridemark or Connecticut (as the case might be) would place an order with Golden Key for manufacture and delivery of the prefabricated house which the customer had ordered; and thereafter Golden Key would ship the materials to the customer's lot, in two deliveries, i.e.: First, the materials for the exterior shell of the house; and then after the shell had been erected, materials for the interior. At the time of each such delivery, Golden Key would bill the dealer corporation for the particular materials shipped; the dealer would thereupon obtain payment for the same from the lending institution with which the customer had made arrangements for his loan.

At the time of the first delivery of materials, Pridemark or Connecticut (as the case might be) would accrue on its books of account as income, 70 percent of the total contract price of the house; and at the time of the second delivery of materials, it would accrue as additional income, the remaining 30 percent of the contract price. The dealer's gross profit in respect of each customer contract which was fully consummated, would be (exclusive of its operating expenses) an amount equal to the dealer's commission or discount of 22 percent of the contract price, which was allowed to it by Golden Key.

As regards the 1,108 uncompleted contracts sold and assigned to Golden Key on which no deliveries of materials had been made, no por-

tion of the contract prices specified therein, and no portion of the customer deposits made in respect thereto, had been accrued or taken into income by Pridemark or Connecticut. However, at the time the contracts were sold, some or all of the above-mentioned services, related to the obtaining of these contracts and to providing assistance to the customers in their meeting the conditions precedent to delivery of materials, had been performed.

The Commissioner, in the notices of deficiency issued herein to Pridemark and Connecticut, determined that said corporations derived gains from their sales of said uncompleted contracts to Golden Key in their fiscal years ended February 28, 1958, and May 31, 1958, in the respective amounts of $97,547 and $17,321 (exclusive of certain customer deposits thereon which they retained); that these gains were not exempt from income tax because said corporations did not qualify under section 337; and that the same were taxable as ordinary income under section 61 of the 1954 Code.

### OPINION RE ISSUE 2

In our preceding opinion for Issue 1, we have in substance approved the Commissioner's determination under the present issue that the gains which Pridemark and Connecticut realized from selling certain of their uncompleted customer contracts to Golden Key, are not exempt from income tax; and accordingly the only remaining question to be decided under the present issue is whether the Commissioner was correct in determining that such gains are to be taxed as ordinary income, rather than as capital gains.

The Commissioner has contended on brief that such gains qualify as ordinary income, because they represent consideration for an anticipatory assignment of income—that is, a lump-sum consideration for the advance assignment of income which they otherwise would have received in the form of dealer commissions or discounts if they had retained said contracts until Golden Key had made its deliveries to the customers.

We agree with such contention. As we have hereinabove found, Pridemark and Connecticut were principally service organizations which derived their incomes by obtaining customer contracts for Golden Key prefabricated houses, through advertising, circulation of catalogs and sales pamphlets, and the solicitation of prospective customers; and also by assisting customers in making their arrangements for financing and erection of the houses. In those situations where customer contracts that were not assigned were consummated through deliveries of materials by Golden Key, these dealer corporations derived and accrued as ordinary income for their services, dealer commissions or discounts equal to 22 percent of the contract prices of the houses.

In the instant case, on the other hand, said dealer corporations sold and assigned to Golden Key upon termination of their dealership arangements with that company, 1,108 uncompleted customer contracts on which no deliveries of materials had been made, and on which they had not, in accordance with their usual practice, accrued any income, either in respect of the contract prices or in respect of the customer deposits made thereon. The consideration they received for these assignments was determined, as we have hereinabove found, through use of a formula embodied in the sale agreement. In accordance with this formula, estimates were made not only as to probable number of said contracts which would be consummated through deliveries of materials, but also as to the average contract prices which probably would be realized; and then, as to that portion of these contracts which were expected to be completed, a lump-sum consideration was agreed upon and paid. This lump-sum consideration was equal to 20 percent of the estimated contract price of the estimated deliverable houses, in lieu of the 22-percent rate which said dealer corporations would have been entitled to receive if their dealership arrangements had not been terminated and they had continued to retain such contracts until Golden Key made its deliveries of materials thereon. There is no question that if they had retained these contracts until deliveries thereon had been made, the 22-percent sales commissions or discounts thereon would have been taxable as ordinary income.

In *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, the Supreme Court said with respect to the consideration received for anticipatory assignments of oil payment rights and a sulphur payment right:

We do not see here any conversion of a capital investment. The lump sum consideration seems essentially a substitute for what would otherwise be received at a future time as ordinary income. * * * The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property.

The above principle enunciated in the *Lake* case has also been applied to render taxable as ordinary income, consideration received for the anticipatory assignment of contracts involving services either performed or yet to be performed. See for example, *United States* v. *Eidson, Jr.*, 310 F. 2d 111 (C.A. 5), in which the court not only held that the taxpayers realized ordinary income, not capital gain, when they received consideration for assignment of a contract to manage an insurance company; but it also disposed of a contention that the assignors could not otherwise have received the income without performing additional services. As to the latter point, it said:

the fact that the taxpayers would have to spend their time and energies in performing services for which the compensation would be received merely affects the price at which they would be willing to assign or transfer the contract. We think, therefore, that the language of the Supreme Court opinion in *Commissioner* v. *P. G. Lake, Inc.* * * * clearly describes the situation before the Court here * * *

For additional cases in which it was held that proceeds from anticipatory assignments of contracts involving services are taxable as ordinary income, see: *Hyatt* v. *Commissioner*, 325 F. 2d 715 (C.A. 5), affirming per curiam a Memorandum Opinion of this Court (involving proceeds from assignment of rights under a general insurance agency contract); *Thurlow E. McFall*, 34 B.T.A. 108 (involving proceeds from assignment of rights under an employment contract); and *General Guaranty Mortgage Co. Inc.* v. *Tomlinson* —— F. Supp. —— (M.D. Fla.), (involving transfer by a corporation to its sole stockholder of the right to future income from mortgage servicing contracts).

Based on all the foregoing, we sustain the Commissioner's determinations as to this issue.

*Issue 3—Re Customer Deposits on Contracts Sold to Golden Key, Which Were Retained by Pridemark and Connecticut.*

#### FINDINGS OF FACT

As we have hereinabove found as facts under Issue 2, Pridemark and Connecticut sold and assigned to Golden Key on February 10, 1958, a group of 1,108 uncompleted customer contracts, of which 258 contracts were considered to be in active status, and the remaining 850 were in inactive status. Immediately prior thereto, these petitioner corporations held a substantial number of customer deposits pertaining to said 1,108 contracts; but only a portion of such deposits was delivered to Golden Key at the time the contracts were assigned, and the remainder thereof was retained by Pridemark and Connecticut for their own benefit. The total amounts of said deposits, and the portions thereof which were delivered and retained, were as follows:

|  | Pridemark | Connecticut |
| --- | --- | --- |
| Total deposits on hand at Feb. 10, 1958 | $45, 206. 03 | $8, 913. 76 |
| Portion delivered to Golden Key | 18, 999. 00 | 4, 725. 00 |
| Portion retained | 26, 207. 03 | 4, 188. 76 |

The deposits so retained were those which had previously been received in connection with said 850 contracts that were considered to be in inactive status, in that no contact had been had with the customers for some time.

Prior to the sale and assignment of said contracts to Golden Key, all customer deposits had been credited by Pridemark and Connecticut to contingent liability accounts, pending decisions by them as to whether the same would be treated as forfeited by the customers and taken into their incomes, or as to whether such deposits might be applied to satisfy possible claims for refund, or be applied toward payment of the contract prices of houses if the contracts should thereafter be consummated. Following the assignment of the contracts to Golden Key, these petitioner corporations still continued for a time to carry the retained customer deposits in their contingent liability accounts without taking them into income. However, shortly before the close of the fiscal years of Pridemark and Connecticut which ended on February 28, 1958, and May 31, 1958, respectively, these corporations declared portions of said deposits to be forfeited, and took the forfeited amounts into their incomes for their 1958 fiscal years. But as to the balance of these retained deposits, they still held the same in their contingent liability accounts until January 7, 1959; and then declared these deposits also to be forfeited, and took them into their incomes for their final 1959 taxable periods.

The cash amounts of all said retained deposits were held by Pridemark and Connecticut under a claim of right, subject only to an indemnification agreement contained in the sales contract with Golden Key, under which they agreed to "indemnify Buyer and hold Buyer harmless from any claim made by purchasers [i.e., customers] under contracts sold herein." So far as the record shows, the cash amounts of these deposits were not deposited in any separate fund or bank account, nor were they in any manner restricted from being used for general corporate purposes in the same manner as any other cash assets.

The Commissioner, in the notices of deficiency which he issued herein to Pridemark and Connecticut, determined that there should be included, as ordinary income, in the incomes of said petitioner corporations for their respective fiscal years ended in 1958, all retained deposits respecting the customer contracts which they had sold and assigned to Golden Key during said fiscal years; and he then reduced the incomes of these petitioner corporations for their 1959 taxable years, by the amounts of deposit income which they had included in their returns for said periods.

OPINION RE ISSUE 3

We have concluded, after considering and weighing all the evidence relative to this issue, that the above determination of the Commissioner should be sustained.

The deposits involved, as before stated, related to inactive contracts,

in respect of which no contact with the customers had been had for some time. No actual liability with respect to these contracts had arisen. Also after the contracts had been assigned, the petitioner corporations had no direct responsibility with respect thereto; and the mere possibility that at some indefinite future time, some *secondary* guarantee liability to Golden Key might arise under the above-mentioned indemnity agreement is not, in our opinion, sufficient to defer the taking of such deposits into the taxable incomes of the petitioner corporations.

Moreover, Pridemark and Connecticut, from the time of the assignment of the inactive contracts, held the cash funds represented by said deposits under a claim of right, without any indication in the evidence that these cash funds were deposited in any special segregated bank account, or that they were not commingled with the other operating funds of the petitioner corporations, free from any restriction as to their use. See in this regard: *North American Oil Consolidated* v. *Burnet*, 286 U.S. 417; *Brown* v. *Helvering*, 291 U.S. 193; *South Dade Farms, Inc.* v. *Commissioner*, 138 F. 2d 818 (C.A. 5), affirming a Memorandum Opinion of this Court; *Wallace A. Moritz*, 21 T.C. 622; *Your Health Club, Inc.*, 4 T.C. 385; and *South Tacoma Motor Co.*, 3 T.C. 411.

Based on all the foregoing, we decide this issue in favor of the respondent.

*Issue 4—Re Deductibility by Pridemark of Legal Fees Incident to the Transaction With Golden Key*

FINDINGS OF FACT

Pridemark, during its fiscal year ended February 28, 1958, and also during its subsequent fiscal period ended on January 7, 1959, incurred legal fees in the respective amounts of $1,825 and $675, which the parties in the stipulation of facts filed herein, have agreed were "performed in connection with the sale of assets to Golden Key." These capital assets were various items other than the customer contracts above mentioned.

Pridemark deducted said amounts as ordinary and necessary business expenses on its income tax returns for said fiscal periods.

The Commissioner, in his notice of deficiency herein, disallowed these claimed deductions on the ground that "such expenses are attributable to the sale of capital assets [to Golden Key]"; and he further stated that such amounts had been allowed however "as an offset against the gain realized on the sale of capital assets in the taxable year ended February 28, 1958."

We agree with the Commissioner's determination. It is a well-settled principle that, generally where assets have been sold, expenses incident to effecting such sale are to be treated for income tax purposes as an offset in computing the gain realized on the sale. *Lucien H. Tyng*, 36 B.T.A. 21, 32–33, modified on other issues 106 F. 2d 55 (C.A. 2); and *Estate of Bessie E. Machris*, 34 T.C. 827. See also to the same effect, *Samuel C. Chapin*, 12 T.C. 235, 238.

Pridemark, in support of its contention to the contrary, has relied on our decision in *Pacific Coast Biscuit Co.*, 32 B.T.A. 39; but that decision is distinguishable on its facts. There we held that expenses incurred in the complete liquidation, winding up, and final dissolution of a corporation, were deductible in the year of such dissolution. In the instant case however, Pridemark (as we have held in Issue 1) was not completely liquidated and wound up—but rather was reorganized; and thereafter the business enterprise was continued in modified corporate form, with continuity in ownership and also continuity in the field of business. Moreover, the legal fees involved in the instant case were incurred, not in winding up the business, but in selling certain assets to Golden Key at the time when the dealership agreement with that company was terminated, prior to the making of a new dealership arrangement with Hilco Homes.

We decide this issue for the respondent.

*Issue 5—Re Deduction by Pridemark of Reasonable Compensation to Eugene and Jules Blitz*

### FINDINGS OF FACT

1. Petitioner Eugene Blitz was on February 23, 1956, the holder of all the issued and outstanding stock of Pridemark corporation (then named Prefab Homes & Suppliers, Inc.) except for certain nonvoting preferred shares which it had issued to employees. On this date, he and said corporation entered into a written agreement relative to his employment compensation—which agreement (unless terminated for reasons not here material) would remain in effect for an original term of 5 years, and would thereafter continue to be in effect from year to year until either party should give specified written notice to the other. No such notice of termination was ever given.

The here relevant provisions of said agreement included, in substance, the following:

That "The term 'Employer' shall include Prefab Homes & Suppliers, Inc. [herein called Pridemark] *and* any * * * *successor* to Prefab Homes & Suppliers, Inc." (Emphasis supplied.)

That Eugene Blitz would be paid "basic compensation" in the sum

of $40,000 per year, for a period of 5 years commencing on January 1, 1956. This basic compensation was to be paid currently and in weekly installments.

That, in addition to the foregoing basic compensation, Blitz would be paid "contingent compensation" in the amount of $10,000 for each calendar year that he might be employed under the agreement, commencing on January 1, 1956; provided however, that no payment of such contingent compensation would be made unless Blitz complied with the following conditions:

(1) That he duly performed his services during the period of his employment;

(2) That he should not have engaged in a competing business, without the consent of the employer; and

(3) That he should during the period of receiving contingent compensation, render advisory or consulting services to the employer.

Any such contingent compensation was not to be paid until after Blitz "ceases to be employed by Employer [as above defined]"; and in the event of his death, any such compensation was to be paid to his widow, or if she predeceased him, to his heirs at law. Also, any amount of contingent compensation becoming payable was to be paid in 60 equal monthly installments, the first of which was to be paid "on the last day of the month next succeeding the month in which the last payment of basic compensation under the employment arrangement then in effect was made."

Pridemark, during the years ended 1956 through 1958, paid basic compensation to Eugene Blitz under said agreement, in the following amounts:

Fiscal year 1956—$35,000.
Fiscal year 1957—(Amount for this fiscal year not shown, but amount for 1957 calendar year was $34,020.)
Fiscal year 1958—$33,220.

All of these amounts were less than the basic compensation called for in the agreement. The corporation did not accrue during any of said years, any amount in respect to the contingent compensation.

For its 10-month fiscal period ended on January 7, 1959, Pridemark deducted on its return, as compensation to Eugene Blitz, the amount of $47,700. This amount included $17,700 basic compensation, plus $30,000 contingent compensation computed with respect to the 3 calendar years 1956, 1957, and 1958.

During said 10-month fiscal period ended January 7, 1959, Eugene Blitz devoted all his time to serving as president of Pridemark; and in this capacity he also was principally responsible for the company's affairs.

Subsequent to January 7, 1959, Eugene Blitz was employed as secretary of Pridemark's successor in reorganization, Pridemark Enter-

prises, which as we have hereinabove found, continued to engage in the business of selling prefabricated houses that were manufactured by Hilco Homes.

The Commissioner, in his notice of deficiency, disallowed as unreasonable compensation $39,000 of said total amount of $47,700 which Pridemark had claimed on its return for its fiscal period ended on January 7, 1959; and he thereby allowed as reasonable compensation for said period only the amount of $8,700.

2. Jules Blitz was the treasurer of Pridemark from March 1, 1950, until the end of its fiscal period ended on January 7, 1959. During said company's fiscal years ended in 1956, 1957, and 1958, it paid him compensation in the following amounts:

    Fiscal year 1956—$20,879.90.
    Fiscal year 1957— 21,000.00 (approximate).
    Fiscal year 1958— 22,770.00.

There was no agreement providing for payment to him of any contingent compensation.

Pridemark, in its 10-month fiscal period ended January 7, 1959, deducted compensation to Jules Blitz in the amount of $14,590. The Commissioner, in his notice of deficiency, disallowed as unreasonable compensation $9,000 of said amount; and he thereby allowed as reasonable compensation only $5,590.

### OPINION RE ISSUE 5

1. *Compensation of Eugene Blitz.*—As above shown, the Commissioner determined that reasonable compensation to Eugene Blitz for the 10-month period of Pridemark which ended on January 7, 1959, was not more than $8,700; and he allowed no additional amount for contingent compensation. We have concluded and here hold, after considering and weighing all the pertinent evidence, that said determined amount is too low; and that the reasonable basic compensation to Eugene Blitz for said period is $17,700—which amount is equal to the basic compensation actually paid to him by Pridemark and included in the total amount of $47,700 deducted on its return. In reaching this conclusion, we have taken into consideration the long period of his services as president and chief executive officer of said corporation, the nature of the services which he rendered, the nature of the business of Pridemark, and the amounts of compensation which had been paid to him in preceding fiscal years.

Turning to the additional contingent compensation for which Pridemark claimed deduction in respect of Eugene Blitz for said 1959 fiscal period, we agree with the Commissioner that no portion of the same is deductible. Our reasons for this are as follows,

The employment agreement specifically provided that such contingent compensation would be payable only "after the Employee [Eugene Blitz] ceases to be employed by Employer under this Agreement"; and it also specifically provided that "The term 'Employer' shall include Prefab Homes & Suppliers, Inc. [by change of name, Pridemark], and any * * * successor to Prefab Homes & Suppliers, Inc." In our opinion, this condition precedent to any payment of contingent compensation was not met.

In the instant case, Pridemark (as we have held in Issue 1) was not completely terminated and wound up, but rather was reorganized within the meaning of section 368(a)(1)(F) of the 1954 Code, in such manner that following this reorganization the business enterprise was continued in modified corporate form through Pridemark Enterprises; and thereafter Eugene Blitz continued to be employed as an officer in such continuing business enterprise in its sale of prefabricated houses. In these circumstances, Pridemark Enterprises must be regarded as a successor to Pridemark within the meaning of the express terms of said employment agreement; and also Eugene Blitz must be regarded as not having ceased to be employed by the "Employer," as that term is specifically defined in said agreement.

Moreover, in order for any contingent compensation to be deductible, it must constitute reasonable compensation within the meaning of sections 162(a)(1) and 404(a)(5) of the Code. In the instant case, there is no evidence which would support a conclusion or finding that the reasonable compensation of Eugene Blitz for any of the years 1956 through 1958 (the years with respect to which the contingent compensation in question was computed) was more than the amounts of the basic compensation actually paid to him during said years. Likewise, as regards the 10-month period ended on January 7, 1959, we are impelled to conclude that the reasonable compensation for said period was not more than the amount of $17,700 basic compensation which Pridemark claimed and we have approved with respect to that period.

2. *Compensation of Jules Blitz.*—Concerning Jules Blitz, we have concluded after considering and weighing all the pertinent evidence, that the amount of compensation which the Commissioner determined to be deductible by Pridemark also is too low; and we have concluded and here hold that the reasonable compensation to him for the fiscal period ended January 7, 1959, is $14,590, as claimed by Pridemark on its return.

*Decisions will be entered under Rule 50.*