Orville L. Olson, Sr. and Ruby A. Olson, Transferees v. Commissioner.
Olson v. Commissioner
Docket No. 5287-67.
United States Tax Court
T.C. Memo 1970-92; 1970 Tax Ct. Memo LEXIS 268; 29 T.C.M. (CCH) 445; T.C.M. (RIA) 70092; April 23, 1970, Filed *268 Petitioners were the sole shareholders of Bottled (Olson) Gas Shop, Inc., a corporation engaged in the distribution of propane gas and related equipment. Pursuant to a plan adopted for the complete liquidation and dissolution of the corporation within a twelve-month period as provided by section 337, IRC 1954, the corporation sold its propane gas business and all of its assets, real and personal, except its accounts receivable, to Ashland Oil & Refining Company. Ashland paid $125,000 of the purchase price on February 1, 1965, designated as the first closing date, and the balance, amounting to $160,000, on March 23, 1965. The petitioners operated the business of the corporation until February 1, 1965, when it was taken over by Ashland, and continued to render services to the corporation during the remainder of the year. Ruby went to the office each day until April 1, 1965, designated as the second closing date. Thereafter, her services consisted of contacting customers by telephone from her home for the purpose of collecting accounts receivable, obtaining new leases for equipment in possession of customers and otherwise assisting in maintaining good relations *269 with the customers. She also maintained records relating to the collection of accounts and the liquidation of the corporation. The total compensation paid her for 1965 was $8,625.50. Respondent determined that $7,187.92 of such compensation was excessive. Held: The compensation paid Ruby for the year 1965 was not excessive or unreasonable and was deductible by the corporation under the provisions of section 162(a), IRC 1954. Lee S. Jones, Kentucky Home Life Bldg., Louisville, Ky., for the petitioners. Frederick W. Krieg, for *270 the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined a deficiency in corporation income tax of Bottled (Olson) Gas Shop, Inc., in the amount of $5,845.25 for the taxable year ended December 31, 1965, and notified petitioners that the amount of such deficiency, plus interest as provided by law, constituting their liability as transferees of assets of the corporation, would be assessed against them. Petitioners have conceded that they are transferees of the assets of Bottled (Olson) Gas Shop, Inc., and as such that they are liable for any deficiency, plus interest thereon as provided by law, found to be due from the corporation for the taxable year 1965. Respondent has conceded that the corporation was entitled to a deduction, for the taxable year 1965, for $5,000 paid by it for legal services. The only issue remaining for our determination is whether and to what extent, if any, the salary paid by Bottled (Olson) Gas Shop, Inc., to Ruby A. Olson for the taxable year 1965 is excessive. Findings of Fact The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The petitioners, *271 Orville L. Olson, Sr., and Ruby A. Olson, are husband and wife and resided in Louisville, Kentucky, at the time the petition herein was filed. Bottled (Olson) Gas Shop, Inc., sometimes referred to herein as the corporation, was a corporation organized in 1949 under the laws of Kentucky with its principal place of business in Louisville, Kentucky. It filed a corporation Federal income tax return for the calendar year 1965 with the district director of internal revenue at Louisville. The petitioners were the sole shareholders and officers of the corporation. Orville owned 70 of the 100 shares of stock outstanding and was president. Ruby owned 30 shares and was secretary. The principal business of the corporation was as a distributor in the propane gas and equipment industry. The corporation maintained an inventory of liquefied petroleum gas, gas appliances and 446 miscellaneous fittings. In December 1964, it owned over 400 tanks of various sizes for installation at homes or places of use of customers, and 2,500 gas cylinders for use in its business, 11 motor vehicles, and a bulk plant with buildings. Its customers were principally located in several counties of Kentucky and *272 Indiana within 60 miles of Louisville. The corporation employed approximately ten employees other than the petitioners. The gross receipts and taxable income of the corporation as reported on its income tax returns for the years 1961 to 1965, inclusive, were as follows: Year
Gross Receipts
Taxable Income
1961
$277,725.22
$ 23,168.50
1962
300,363.35
1,589.37
1963
384,522.24
10,556.07
1964
313,550.98
(4,525.52)
1965
75,215.80
21,825.23
On December 28, 1964, the petitioners, as stockholders of the corporation, adopted a plan effective January 2, 1965, for the complete liquidation and dissolution of the corporation within a period of twelve months. On the same date, an "Offer to Sell and Agreement to Purchase," was executed by the corporation, as seller, and Ashland Oil & Refining Company, a Kentucky corporation, hereinafter referred to as Ashland, as buyer, wherein it was agreed that the corporation would sell and convey to Ashland the liquefied petroleum gas distribution business of the corporation and its related assets, including good will, real and personal property (except accounts receivable), inventory and equipment, and list of customers. *273 The "Offer to Sell and Agreement to Purchase" provided in part, as follows: 1. Assets to Be Sold and Conveyed. The Seller offers to sell, assign, transfer and convey unto the Buyer the liquefied petroleum distribution business of the Seller, the good will thereof, and all real property, personal property (except accounts receivable which are expressly provided for in paragraph xxxx hereof) and equipment owned or used and intended to be used by the Seller in the petroleum products business, now being conducted by the Seller. * * * 2. Consideration to Be Paid. In consideration for the Seller selling, conveying and transferring to Buyer all of the aforesaid business and property to be purchased hereunder and in consideration for all the other covenants and undertakings of the Seller as set forth herein, Buyer agrees to make payment to Seller on all the terms, provisions and conditions hereof as follows: (a) The total sum of Two hundred eighty-five thousand dollars ($285,000.00). The sum of One hundred twenty-five thousand dollars ($125,000.00) shall be paid on the first closing date, and the balance of One hundred sixty thousand dollars ($160,000.00) shall be paid on the second *274 closing date. Payments may be made by Buyer's check payable to the order of Seller. (b) A sum equal to the net cost, f.o.b. Seller's place of business located on the land described in the attached Exhibit A of all inventory to be purchased and sold hereunder, said sum to be payable within thirty (30) days after the first closing date. Adjustment of Purchase Price. In the event any item of property described in Exhibit B attached hereto is not delivered to Buyer on or before the second closing date or covered by a Loaned Equipment Agreement as hereinafter provided in subparagraph (d) of paragraph numbered 3, the purchase price shall be reduced by the value of the missing item of equipment, less the value of any similar equipment sold hereunder but not listed in Exhibit B. It is intended that the value of any such item of equipment shall be determined as of the closing date by deducting a reasonable amount for depreciation from the cost price. 3. Representations, Warranties and Covenants of the Seller. The Seller warrants and represents to and agrees with Buyer as follows: (a) Seller is the sole owner of the building, assets and real and personal property to be sold hereunder *275 and has good and marketable title thereto free and clear of all liens, taxes and encumbrances (except the lien of current taxes) and that Seller has full legal right and power to enter into this Contract and that it will forever indemnify Buyer against any loss, damage or liability arising from failure or defects of title to such property, claims thereto or liens thereon. (b) That Seller will convey to Buyer on the first closing date by general warranty deed with the usual covenants on a form to be approved by Buyer fee simple title to the land described in the attached Exhibit A together with improvements thereon free and clear of all liens and encumbrances. * * * (c) That on or before second closing date Seller will execute and deliver to 447 Buyer a Bill of Sale in a form satisfactory to Buyer conveying to Buyer all the personal property and equipment listed and described in the attached Exhibit B. * * * (d) That on or before the second closing date Seller will cause to be executed and will deliver to Buyer as to each item of equipment to be sold hereunder and which is loaned to Seller's customers a "Loaned Equipment Agreement" on forms to be supplied by Buyer, a copy *276 of which is attached hereto as Exhibit D, or which [sic] procure and deliver to Buyer such other document as Buyer may request to evidence Seller's title to all equipment in the possession of Seller's customers. (e) That on the first closing date, Buyer will receive immediate possession of all property to be sold hereunder by Seller to Buyer, except for equipment loaned by Seller to its customers * * * * * * (i) Seller will assist Buyer in contacting all customers of Seller and will assist Buyer in securing appropriate new contracts with Seller's customers and will use their best efforts in retaining for Buyer the business and good will of all present and past customers of Seller, and will never injure or attempt to injure the business, good name, reputation, or good will of the business or of Buyer. (j) Seller will continue to operate Seller's liquified petroleum gas distribution business after the date of this contract until the first closing date as Seller has heretofore done, and will make no decision nor take any action with respect to said business, other than in the ordinary course of business without first consulting and obtaining the written consent of Buyer. (k) *277 Seller and Orville L. Olson, Sr. hereby jointly and severally covenant and agree that for a period of five (5) years from and after the first closing date, they will not either individually orjointly with others, or as owners, employees, or agent of any corporation, firm or person, directly or indirectly, engage in the business of selling liquified petroleum gas or gas burning appliances at wholesale, retail or otherwise within Jefferson, Bullitt, Meade, Henderson, LaRue, Nelson, Spencer or Breckinridge Counties, Kentucky, or Floyd or Harrison Counties, Indiana, without the express written consent of Buyer. (1) Seller agrees * * * Buyer may use Seller's trade name in the sale and distribution of petroleum products. * * * 4. ACCOUNTS RECEIV ABLE. On the first closing date Seller will transfer and assign to Buyer for the purpose of collection all of its accounts receivable created by the sale of liquified petroleum gas. Seller hereby authorizes Buyer to accept payment on and attempt to collect said accounts receivable for a period of One Hundred Eighty days (180) days after the first closing date, and Buyer agrees to accept payment on and attempt in a routine fashion to collect *278 said accounts receivable; provided, however, Buyer's obligation to collect such accounts receivable shall be limited to accepting amounts tendered in payment thereon and forwarding appropriate statements and Buyer shall not be obligated to institute suit or take any other action to collect said accounts receivable. Seller and Buyer agree to review Seller's accounts receivable prior to the second closing date and on the basis of such review Buyer will separate said accounts receivable into the following two categories: (a) Those persons whom Buyer would agree to sell on credit and (b) Those persons whom Buyer would sell on a C.O.D. basis only. A list of those persons together with the indebtedness due from each listed under category (a) will be attached to this contract as Exhibit E, and a list of those persons together with the indebtedness due from each listed under category (b) will be attached to this contract as Exhibit F. Buyer agrees that any amounts collected by it during a period of One Hundred Eighty days (180) days from those persons listed on Exhibit E, shall be applied first to the indebtedness due Seller to the extent shown on said Exhibit E, and then to any additional *279 indebtedness due Buyer. While Buyer will agree to accept payments on Seller's behalf from any of the persons listed on Exhibit F, Buyer may upon receipt of any payments from said individuals which are not specifically designated as payments on the indebtedness due Seller apply such payments on indebtedness due Buyer or as payment for products sold on a C.O.D. basis by Buyer. Nothing contained herein shall prohibit Buyer from crediting monies collected in the manner designated by the paying creditor. Seller authorizes Buyer to endorse and negotiate all checks delivered to Buyer which are made payable to the order of Seller. During the aforesaid period Buyer will account for and pay over to Seller on or before the 20th day of each month the amounts collected on said accounts receivable during the preceding month. Within twenty (20) days after the expiration of the aforesaid period of One Hundred Eighty (180) days Buyer shall reassign all uncollected amounts to Seller; 448 provided, Buyer, may, at its option, retain any portion of such accounts by paying Seller the amount due thereon. 5. CONTINUING WARRANTIES AND AGREEMENTS. Although Buyer will endeavor to satisfy itself *280 prior to the second closing date of all factors covered by this Contract, it is agreed that all representations, warranties, covenants and agreements by Seller shall survive the execution and delivery by Seller of all documents required hereby to be executed by Seller and delivered to Buyer and shall continue in full force and effect thereafter; and in the event of any material breach, Buyer shall have the right in addition to any other rights and remedies provided by law therein, to rescind this Contract and the right to damages for such breach. 6. CLOSING DATES. The term "First Closing Date" as used herein means February 1, 1965, or such earlier or later date as may be mutually agreed upon in writing by Seller and Buyer. The term "Second Closing Date" as used herein means April 1, 1965, or such earlier or later date as may be mutually agreed upon in writing by Seller and Buyer. By deed dated February 1, 1965, the corporation conveyed to Ashland the real property owned and used by it in the operation of the propane gas business. On the same date, February 1, 1965, Ashland paid to the corporation $125,000 as the first payment on the purchase price of said business as provided *281 by the contract. The remaining $160,000 of the purchase price was paid to the corporation by Ashland on March 23, 1965. The petitioners continued to operate the business of the corporation until February 1, 1965. Thereafter Ashland took over the entire operation of the business. Both of the petitioners continued to render services to the corporation after Ashland took over the management of the business and during the remainder of 1965. Such services included contacting customers both for the purpose of collecting accounts owed by them to the corporation and for the purpose of obtaining new leases, in favor of Ashland, of the tanks and other equipment which had been installed by the corporation on the customer's premises. Petitioner Orville L. Olson spent much of his time in the field locating and checking such equipment and obtaining new contracts from customers. In some instances the former customers refused to take gas from Ashland and also refused to surrender the equipment. In such instances petitioners accounted to Ashland for the value of the tanks and equipment not transferred. Petitioner Ruby A. Olson accompanied Orville on some of his field trips. Most of her services, *282 however, consisted of contacting customers by telephone, answering inquiries made by customers over the telephone, and keeping the books and records of the corporation. No payroll records (except as to salaries paid petitioners) or records of purchases and deliveries were kept by the corporation after Ashland took over the management of the business. Consequently, records maintained subsequent to February 1, 1965, were less voluminous than those previously maintained. Prior to April 1, 1965, Ruby went to the office of the corporation every day. After April 1, 1965, the second and final closing date of the sale and purchase agreement, most of the work performed for the corporation by Ruby was done in her home. As shown by the balance sheet attached to the income tax return filed by the corporation for 1965, the accounts receivable owed to the corporation as of the beginning of 1965 amounted to $46,468.84. Approximately $36,000.00 of this amount was collected by the end of 1965, - $27,000 through Ashland and approximately $9,000 by direct payments to the petitioners. The corporation paid compensation to Orville L. and Ruby A. Olson for the years 1961 to 1965, inclusive, as follows: *283 Year
Orville L.Olson
Ruby A. Olson
1961
$2,474.21
$7,986.50
1962
1,200.00
7,987.50
1963
3,600.00
8,946.00
1964
2,400.00
8,307.00
1965
3,600.00
8,625.50
The amount of the salaries paid the petitioners for the year 1965 was deducted from the gross income of the corporation on its income tax return for that year. Respondent determined that $7,187.92 of the salary paid Ruby A. Olson for the year 1965 was excessive and increased the taxable income of the corporation for 1965 by that amount. Respondent allowed $1,437.58 of the salary paid her in 1965 as a deduction. Opinion The petitioners Orville and Ruby Olson were the sole shareholders and officers of Bottled (Olson) Gas Shop, Inc., a corporation engaged in the distribution of propane 449 gas. Pursuant to a plan adopted by the shareholders for the complete liquidation and dissolution of the corporation within a twelve month period as provided by section 337 of the Internal Revenue Code of 1954, the corporation sold and transferred all of its assets, except its customer accounts receivable, to Ashland Oil & Refining Company. The corporation continued to operate the *284 business until February 1, 1965. On February 1, 1965, Ashland took over the operation of the business. The petitioners continued to render services to the corporation during the remainder of the year and were paid compensation in the total amounts of $3,600.00 and $8,625.50, respectively, for the year 1965. Respondent determined that "in view of the services performed, the salary of Ruby A. Olson was excessive to the extent of $7,187.92," and increased the taxable income of the corporation to that extent. The only issue presented is whether and to what extent, if any, the salary paid by the corporation to Ruby for the taxable year 1965 is excessive or unreasonable. Section 162(a) of the Internal Revenue Code of 1954 provides that in computing its taxable income a corporation shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." The question whether the salary *285 paid Ruby for the taxable year 1965 is reasonable is one of fact to be determined from all the facts and circumstances of the particular case. Boyle Fucl Co., 53 T.C. 162, 169 (1969) and authorities referred to therein. Respondent's primary contention is that the salary paid Ruby in 1965 was excessive and unreasonable for the reason that she did not do as much work or maintain as extensive records for the corporation after Ashland took over the operation of the business on February 1, 1965, as she had done in previous years. Petitioners contend that Ruby actually performed more work for the corporation during the year 1965 than she had in previous years and that the salary paid her, which was substantially the same as that paid her in previous years, was not unreasonable or excessive. Respondent concedes that Ruby's duties in January, prior to February 1, 1965, when Ashland took over the operation of the business, were no less than they had been in the past, and that on the basis of onetwelfth of the total salary ($718.79) the salary paid her for January was not excessive. Petitioners both testified that Ruby continued to go to the office of the business each day *286 until April 1, 1965. Respondent offered no evidence to contradict this testimony and we find no reason to question it, particularly since April 1st was the "second closing date" and the balance of the purchase price ($160,000) was not payable until then. Compensation paid her for this period was clearly for "personal services actually rendered" to the corporation in carrying on its trade or business. Thus, on the basis of respondent's concession relating to the month of January, reasonable compensation for the services rendered by Ruby for the first three months of 1965 was not less than $2,156.37. Respondent's allowance of a deduction for Ruby's services in the amount of only $1,437.58 for the entire year was clearly erroneous. These facts indicate that the latter figure was arbitrarily arrived at by respondent and materially weaken, if, in fact, they do not destroy, the presumption of correctness which would otherwise apply to respondent's determination. Helvering v. Taylor, 293 U.S. 507 (1935); Durkee v. Commissioner, 162 F. 2d 184 (C.A. 6, 1947). Respondent has also conceded, on brief, that to the extent Ruby's services were related to the collection *287 of the accounts receivable and the liquidation of the corporation, the compensation therefor is deductible as a business expense under the provisions of section 162(a). He contends, however, that since $27,000, or three-fourths of the $36,000 of accounts receivable collected in 1965 were collected by Ashland, it must be concluded that Ruby's services in this connection were not as extensive as in previous years. Under paragraph four of the agreement, Ashland was merely obligated to accept amounts tendered in payment by the customers, to forward appropriate statements and to remit the amounts received to the corporation. It was not obligated to take any other action and there is no evidence that it did. On the other hand, petitioners testified Ruby continued to render services to the corporation throughout the remainder of the year (and thereafter) for the purpose of collecting the accounts receivable as well as for the purpose of obtaining new 450 contracts from the customers for Ashland. Approximately $9,000 of the amount collected was paid directly to the corporation and it is reasonable to assume that such payments as well as many, if not most, of the payments which were made *288 through Ashland, resulted from the telephone and personal contracts which Ruby made with the customers. There was also testimony to the effect that a collection agency's charges for collecting the accounts receivable would have amounted to fifty percent of the amounts collected, or more than twice the salary paid Ruby. We give little weight to respondent's argument concerning the records maintained by Ruby. The volume of such records is not determinative of the value of her services. She apparently kept such records as was necessary to show the amounts of the accounts receivable which were collected and the liquidation of the corporation. Although the evidence is not as precise as might be desired, we are satisfied that the compensation paid Ruby for the taxable year 1965 was not excessive or unreasonable. Respondent further contends, on brief, that most of Ruby's services were performed in connection with procuring and delivering to the buyer evidences of the seller's title to the equipment in possession of its customers and in procuring new contracts with them. It is his contention that the value of such services was a part of the cost of sale and as such is to be considered *289 in determining the capital gain but is not deductible as ordinary and necessary business expenses of the corporation. In support of this contention, respondent relies upon Alphaco, Inc. v. Nelson, 385 F. 2d 244 (C.A. 7, 1967); United States v. Morton, 387 F. 2d 441 (C.A. 8, 1968); and Lanrao, Inc. v. United States, 288 F. Supp. 464 (S.D.Tenn., 1968), affd. per curiam 422 F. 2d 481 (C.A. 6, 1970), certiorari applied for March 13, 1970. He also cites Pridemark, Inc. v. Commissioner, 345 F. 2d 35, 45 (C.A. 4, 1965), reversing in part 42 T.C. 510; and United States v. Mountain States Mixed Feed Co., 365 F. 2d 244 (C.A. 10, 1966), both of which he claims are distinguishable. Respondent's contention presents a new issue, not raised in the pleadings nor mentioned in the opening statements of the parties at the trial. Nor is it reasonably to be inferred from the notice of deficiency. The issue is not before the Court and we specifically refrain from making any determination thereon. We observe, however, that even if the issue had been properly pleaded by him, respondent, upon whom the *290 burden of proof would have rested (Rule 32, Tax Court Rules of Practice), has not established that "most" of Ruby's services, particularly after April 1, 1965, were performed in connection with procuring and delivering evidences of title or other contracts. In fact, it is reasonable to assume that when Ashland made the payment of $160,000 on March 23, 1965, nine days prior to April 1, 1965, the second closing date, it was satisfied with the seller's compliance with the provisions of paragraph 3(d) and (i) of the agreement. Respondent called no witnesses of his own and produced no documentary evidence to establish otherwise. Moreover, although in view of what has been said above it is not necessary for us to so decide, the authorities relied upon by respondent may be factually distinguishable. Alphaco, Inc. v. Commissioner, supra, and Lanrao, Inc. v. United States, supra, both involved professional fees such as broker's commissions and attorneys' and accountants' fees incurred by the taxpayer corporations in connection with the liquidation sale of capital assets. United States v. Morton, supra, involved expenses incurred in processing and collecting a *291 fire loss. None of them involved salaries paid to an employee for services such as were rendered by Ruby. We hold that the compensation paid Ruby by the corporation for the taxable year 1965 was not excessive or unreasonable, and that the total amount of such compensation is deductible by the corporation under the provisions of section 162(a) of the Internal Revenue Code of 1954. Decision will be entered for the petitioners. 451